**GULF, C. & S. F. RY. CO. v. KEMPNER.***
(No. 8685.)

(Court of Civil Appeals of Texas. Galveston. May 6, 1925. Rehearing Denied, May 28, 1925.)

**I. Carriers ⟨⟩186—Liability of terminal carrier for failure to deliver cotton within reasonable time stated.**

Where bales of cotton were not marked as described in order bill of lading, issued by initial carrier, and were therefore refused by transferee of bill of lading as not the cotton purchased, *held*, under Vernon's Sayles' Ann. Civ. St. 1914, arts. 710, 715, 716, and Vernon's Ann. Civ. St. Supp. 1922, arts. 731, 732, that terminal carrier was liable to consignee for difference in market price of cotton at time delivery should have been made and at date that

carrier satisfactorily identified cotton as that covered by bill of lading.

**2. Evidence ⬬⟿471(30)—Statement of witness that he was acting as agent held properly excluded as conclusion.**

In action by consignee of cotton for damages caused by failure to deliver bales because not marked as described in order bill of lading through fault of consignor, statement of consignor that in loading of cotton he acted as agent of consignee *held* properly excluded as a conclusion.

**3. Judgment ⬬⟿18(2), 19—Judgment held not assailable as being without pleading or proof to support it.**

Where, in action to recover damages for failure to deliver cotton within a reasonable time, consignees pleaded that they became owners of a certain number of bales of cotton for which the carrier had issued its negotiable bill of lading, describing it as bearing certain marks, and that carrier had failed to deliver to them cotton bearing such marks, but that they had accepted from it cotton which it had on hand bearing different marks, and had credited such cotton on their claim against carrier, *held*, that judgment was not assailable as being without pleading or proof to support it, in that refusal to accept delivery of the tendered cotton, because not marked as described in bill of lading, was neither declared upon by nor testified to for consignee.

**4. Carriers ⬬⟿104—Where it is established that goods have not been shipped within a reasonable time, a prima facie case of negligence is made, and burden is on carrier to explain delay, etc.**

Where it is once established by consignee that goods have not been delivered within a reasonable time, a prima facie case of negligence is made, and burden devolves on the carrier to show that delay arose from some cause other than carrier's negligence.

Error from District Court, Galveston County; Robt. G. Street, Judge.

Suit by H. Kempner against the Gulf, Colorado & Santa Fé Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Terry, Cavin & Mills and O. B. Wigley, all of Galveston, for plaintiff in error.

Williams, Neethe & Williams, of Galveston, for defendant in error.

GRAVES, J. The gist of this cause as presented here, both as to substance and procedure, is this:

On September 10, 1920, through telegraphic correspondence between them, J. G. Ramsey at Edinburg, Tex., agreed to sell to H. Kempner, at Galveston, Tex., 25 bales of cotton "loaded to arrive in Galveston, immediate shipment." Pursuant to such contract of sale, on the next day, September 11, 1920, he delivered the 25 bales to the Brownsville Railway Company at Edinburg, receiving

from that company a through bill of lading therefor, showing the cotton to be consigned to his order, destination Galveston, Tex., notify Kempner, and describing it as marked "L. T. B." This arrangement meant that Ramsey was to load the cotton at Edinburg, which he did, stating to the initial carrier's agent at the time that he would have each bale of it marked L. T. B. but failing in fact to do so, and the agent delivering to him the bill of lading so reciting without the marking having been put on. Ramsey then drew on Kempner for their agreed purchase price, attaching this bill of lading properly indorsed by himself to Kempner, which papers were received in due course by the latter, who paid the draft at Galveston before the arrival there of the cotton.

Kempner's trustees, the defendants in error, indorsed the bill to their representative, the Compress Company, which at once turned the same over to the Santa Fé Railway Company, the plaintiff in error, at the same time notifying it of the ownership of the cotton by defendants in error and directing that delivery be made to it, the Compress Company, for them. The Santa Fé Company, through its agent, accepted the bill of lading, issuing its receipt therefor to the Compress Company, and agreed to deliver the cotton to Kempner when it should arrive in Galveston. The shipment of cotton, thus without the marking called for in the bill of lading, went forward promptly from Edinburg, reaching Galveston September 17, 1920.

Coincident with the arrival of the shipment in Galveston, the Santa Fé's office there received a waybill covering 25 bales of cotton marked L. T. B., supposed to have been shipped in Penn. Car 16541; when that car was opened on the same day, however, it was found to contain no cotton marked L. T. B., but did contain 25 bales of various other marks. The Santa Fé's freight clerk, after having taken the matter up with the sending agent of the Brownsville Road at Edinburg and being advised by letter from him that the cotton in the car was the same as that intended to be covered by the waybill and bill of lading, on September 27, 1920, and before any checking of the gin numbers it bore had been made with the numbers called for in the bill of lading, by telephone offered to deliver it to defendants in error, which tender they refused on the ground that the marks were not the same and the identity had not been established. A similar tender, conditioned, however, on defendants in error proving that this particular lot of cotton was theirs, made to another of their agents either a few days before or after September 27—whether one or the other date not being clear from the testimony—was likewise declined. Thereafter the cotton remained on the railway company's platform, it retaining

possession of the bill of lading all the while, until on November 10, 1920, its freight clerk, in conjunction with a representative of defendants in error, for the first time checked the tag numbers on the bales with those called for by the bill of lading, and found them identical. Tender of delivery was again made on that date, and also refused by defendants in error upon the same ground.

No cotton marked L. T. B. as described in the bill of lading was ever turned over to Kempner, but on April 19, 1921, by special arrangement between the parties, 25 bales bearing other marks were received by defendants in error from the railway company under agreement to apply the value thereof in part payment of their claim for damages against plaintiff in error for failure to promptly deliver the specific 25 bales described in the bill of lading.

The suit was by them to recover the alleged balance due of such damages, based on their claim that their cotton should have—as upon reasonable dispatch—been delivered to them on September 17, 1920, instead of on April 19, 1921, the date they thus accepted a settlement, measuring the amount claimed by the difference in market values on the dates so fixed.

The trial court, on a finding to the effect that the identity of the cotton as theirs had been made reasonably certain on November 10, 1920, but not before, concluded that they should have accepted it on that date and gave them judgment for the difference in the market values of the 25 bales on September 17, when it actually arrived in Galveston and should have been delivered in the exercise of reasonable diligence, and on November 10, when they became in duty bound to receive it. There were other fact findings as to the values on the dates involved, about which there is no controversy, and to the effect that the bill of lading misdescribing the cotton as being marked L. T. B. was issued through the negligence of the initial carrier, the Brownsville Company, without the knowledge at the time of either party to this suit; such negligence being the sole cause of the delay in the tender at Houston of the 25 bales in question.

[1] On the appeal the plaintiff in error, in the face of the finding just noted that the mismarking and consequent delay were due entirely to the negligence of the initial carrier, and without attacking it as lacking support in the evidence but relying thereon as correctly reflecting the record, seeks a reversal on propositions to the effect: First that the delay in the delivery of the cotton being caused by the act of the shipper, Ramsey, in not marking it as he agreed to do, the culpatory act was that of another for which neither carrier was liable; second, that no negligence on its part being shown, plaintiff in error, as the terminal carrier, was not responsible for the delay complained of, since it was found by the trial court to be solely due to the negligence of the initial carrier.

This position is untenable, because grounded on a distinct tangent from the fairway of fact upon which the adverse judgment rested and of the law as declared in our statutes. See Vernon's Sayles' Civil Statutes, arts. 710, 715, 716 of 1914, and articles 731, 732 of 1922 Supplement.

Plaintiff in error was bound by the determination of fact that the error in issuing the bill of lading and the consequent delay were due to the negligence of its connecting line, the receiving carrier, and that being true, the question involved is reduced to one of whether or not it, as the delivering carrier, was also bound to answer to the owners of the cotton for the consequences of that negligence. That it was, under the further facts here appearing, we think the statutes referred to plainly declare. They required the carrier to issue its written bill of lading, thereby expressly making that procedure its own act for which it would be responsible to the party whose interest might be adversely affected, article 716 also prescribing that, among other things, it must contain "a description of the goods or packages containing them, which may, however, be in terms such as may be approved by the railroad commission." Evidently no less a description than one that would reasonably identify the goods carried with those received was contemplated, and it certainly cannot be said that one which affirmatively misdescribes them by reciting that they bear markings they do not in fact bear is a proper one, either under this statutory provision or upon general principles of common sense.

The misdescription therefore constituted the failure to discharge a plain and nondelegable duty directly owing by the railroad companies to the owners of the bill of lading for the cotton, Kempner's trustees, and it is no answer to its violation to say, as plaintiff in error does, that the negligent act of its connecting carrier was induced by the promise to it of Ramsey to properly mark the shipment. If the suit had been between the carrier and Ramsey, that consideration might have been a defense against him, estopping him from asserting any claim arising out of a misdescription he himself was responsible for; but how in the circumstances it could be asserted against the defendants in error is not perceived. While in the pleadings it was claimed that Ramsey delivered the cotton to the initial carrier merely as their agent, the charge was not substantiated, and no contention based upon that hypothesis is now made.

An order bill of lading, such as this one was, is made negotiable by statute, and since defendants in error held it under a straight-out purchase of the cotton from Ramsey it

constituted a receipt for, no such estoppel as might have otherwise been available against him would bar their rights; while at common law the carrier may not be held liable for loss of, injury to, or delay in the delivery of goods caused by the act of the shipper, the case is different where, as here, the carrier has been guilty of negligence in the performance of a duty it owes to those rightfully holding and placing reliance upon the bill of lading it has issued pursuant to statutory requirement; in such an instance the injury for which redress is sought is not one caused by the act of the shipper and in no wise contributed to by any breach of duty on the carrier's part.

Moreover, the developed facts of the case clearly brought home to plaintiff in error, under articles 731, 732, supra, responsibility for this negligence of the other carrier at the point of origin. It was undisputedly shown that the bill of lading constituted a through contract of shipment, that plaintiff in error as a connecting line received, transported, and agreed to deliver the goods under it, issuing its receipt at Galveston for the contract itself, and by such acts undoubtedly recognizing, adopting, and acquiescing in the undertaking of the initial carrier in so issuing it. This fastened liability upon it by express provision of the statute last cited.

It is next contended that, under the trial court's finding that the actual cotton so turned over to the initial carrier arrived in Galveston September 17, and was tendered by plaintiff in error to defendants in error on September 27, the latter were bound to accept it and had no right of action for subsequent delay in delivery, notwithstanding the fact that it was not marked as described in the bill of lading. We do not think so, concluding rather that they, being the holders of a negotiable bill of lading calling for a specially described lot of cotton, were fully justified in declining to receive cotton bearing wholly different marks unless and until it was reasonably identified as being that actually shipped and covered by their bill of lading, they themselves being free from negligence in their refusal to sooner accept delivery, as the trial court necessarily found they were in giving them a recovery for the decline in market value of the cotton up to the date it fixed as being the time when the identification became reasonably certain, that is, November 10. While the finding upon that feature is not attacked, it could not be said to be against the weight of the evidence, if it had been; as above recited, no checking even of the gin tags the shipment bore was ever made with the numbers called for in the bill of lading, it at all times had in its possession, by plaintiff in error until November 10, and it further undisputedly appears that it was then induced to make that simple effort, which apparently ordinary prudence would have dictated in the beginning, on the initiative of the defendants in error in their search for the particular cotton they had bought.

Especially does this conclusion that acceptance in the absence of identification was not compulsory upon defendants in error seem sound, when the facts also show that delivery of the cotton to them at once on its arrival in Galveston was refused by the agents of plaintiff in error on that very ground—that it did not belong to them, being listed and checked on the latter's books as "over" cotton—the initiation of the period of delay for the consequences of which the suit sought redress thus being due to the railway company's affirmative act.

By contract in writing the railway company here undertook to transport and deliver particular bales of cotton, not merely an equal number of other bales of like grade and weight, and no good reason has been suggested for not holding it to the performance of the precise agreement it so made; certainly it cannot be said that, had the 25 bales it thus held on hand so long been in fact different from that it received, it could—whatever its own ability to transfer good title—have legally compelled them to accept goods they did not own, thereby subjecting them, nolens volens, to the probable burdens of a suit for conversion by the true owner; nor can it be with any better reason, we think, when the actual situation is that, through its negligence, the cotton seemed to be different from that described in the bill of lading it had issued and delivered, thereby, to all appearances at least, rendering plaintiff in error unable as against the owner to pass good title to it to defendants in error.

In the condition of things thus thrust upon them, it seems to us defendants in error were only required to act as would persons of reasonable prudence, and that as such they could not be held to be beyond their rights in declining acceptance of cotton not identified as what they bought; to adopt in conclusion upon this point the language of able counsel for defendants in error:

"The court applied what we believe to be the true rule: That where, by the negligent acts of the carrier's agent, the identity of goods which it seeks to deliver to one holding its bill of lading is made doubtful, the holder is not required to accept them until the doubt is reasonably removed by information coming to him, and that the carrier must bear the responsibility for any delay thus caused to which the holder has not negligently or captiously contributed."

[2] Remaining presentments assailing the judgment as being without pleading or proof to support it, in that refusal to accept delivery of the tendered cotton because not marked as described in the bill of lading was neither declared upon by nor testified to for defendants in error, and challenging as

error the exclusion of the proffered statement of the witness Ramsey that in loading the cotton he was acting as the agent of Kempner, are overruled. All the facts touching the contract of sale of the cotton between Ramsey and Kempner were in evidence, and the question as to whether he, in delivering it to and obtaining the carrier's bill of lading therefor, was performing a duty due by him to defendants in error as their vendor or was merely acting as their agent was clearly one of law; hence the statement tendered was only a conclusion of the witness and properly excluded.

[3] As concerns the claim for a lack of support in the pleadings and proof for the judgment as rendered, we think it puts the cart before the horse. The issue over the right of defendants in error to refuse acceptance of the cotton because of discrepancy between the marks it bore and those called for in the bill of lading they held arose, not upon their original declaration of their cause of action, but upon the answering pleadings of the plaintiff in error in which it sought to excuse itself for its failure to promptly deliver cotton marked as designated in the bill of lading. The defendants in error first having pleaded that they, by purchase, became the owners of 25 bales of cotton for which the carrier had issued its negotiable bill of lading describing it as bearing certain marks, which bill of lading they held; that the carrier had failed and refused to deliver to them cotton bearing such marks, but that they had accepted from it cotton which it had on hand bearing different marks, with the understanding that the value thereof should be credited on their claim against the carrier for failure to deliver cotton of the same description as that contained in the bill of lading, and the carrier then having pleaded as an excuse for its failure to deliver cotton so marked that the receiving agent had been induced to issue the bill of lading showing the cotton to be so marked by a promise of the shipper to see that it should be marked that way; that the shipper had failed to fulfill his promise, and that the cotton actually received was duly transported to Galveston and delivery of the same here tendered to the defendants in error—there was sufficient support for a judgment for the decline in the value of the cotton from the date of its arrival to the date when the court found under the evidence that plaintiff in error knew, or should have known, that the cotton held by it was that actually shipped.

[4] The evidence adduced by them substantiated the cause of action thus declared upon by defendants in error, thereby making out a prima facie case in their favor, and, without the necessity of further pleading upon their part, shifted to the railway company the burden of both pleading and proving a valid excuse for its failure to promptly deliver just what it had contracted to do. The rule on the subject is thus tersely stated in 10 Corpus Juris, at page 301, par. 429:

'When evidence of unusual delay is adduced, a prima facie case of negligence is made out, and the burden then devolves on the carrier to explain the delay and to show that it arose from some cause other than the carrier's negligence, or that of its agents or servants."

See, also, M. K. & T. v. Stark Grain Co., 103 Tex. 542, 131 S. W. 410.

The sufficiency of the exculpatory pleading and evidence actually offered by plaintiff in error was clearly a question of law to be determined by the court, which was hearing the case without a jury, and a rejoinder from opposing litigants to the effect that such excuse was insufficient at best would have amounted to nothing more than an ipse dixit upon their part, and therefore an unnecessary appendage.

It follows from these conclusions that the trial court's judgment should be affirmed; it has been so ordered.

Affirmed.