## GULF, C. & S. F. RY. CO. v. KEMPNER et al. (No. 794–4454.)

(Commission of Appeals of Texas, Section A. April 28, 1926.)

**1. Carriers ⚖═94(4) — Loss in value after proper tender wrongfully declined held not recoverable from carrier as damages for failure to deliver cotton promptly after arrival at destination (Rev. St. 1925, arts. 885, 905, 906).**

Where cotton transported to point of destination, as required by Rev. St. 1925, arts. 885, 905, 906, was properly tendered 10 days later to holder of shipper's order bill of lading, subsequent loss in market value was attributable to his unwarranted refusal to accept it, not to carrier's failure promptly to deliver it, and hence was not recoverable from carrier.

**2. Carriers ⚖═89—Assignee of bill of lading, describing bales of cotton as marked with certain initials, held not entitled to refuse tender of bales shipped but not marked as shipper had promised, bill of lading being both receipt and transportation contract, symbolic of what was actually shipped.**

Where shipper failed to mark bales of cotton with certain initials, as he promised carrier's agent to do while loading them into car, in which shipped under bill of lading, procured on such promise, describing bales as so marked, his assignee could not refuse tender of such bales to him as holder of bill of lading, which

is both receipt and transportation contract, symbolic only of what was actually shipped.

**3. Evidence ⊜⟿407(2)—Ordinary bill of lading as receipt for goods purportedly delivered for shipment is open to explanation, modification, or contradiction through proof aliunde (Rev. St. 1925, arts. 885, 890, 894).**

At common law, which is not changed by, but redeclared, in statutes treating goods as actually delivered for shipment, and thence to be forwarded and delivered "in like order and condition" (Rev. St. 1925, art. 885), as basis of transportation contract, with possible exception in articles 890, 894, bill of lading as receipt for goods purportedly delivered for shipment is open to explanation, modification, or contradiction through proof aliunde.

**4. Carriers ⊜⟿55—Ordinary bill of lading is not true negotiable instrument, but assignee is presumed to have acquired it with knowledge that goods may not conform to exact description, and that shipper wrongfully procured bill falsely describing them (Rev. St. 1925, arts. 885, 890, 894).**

Bill of lading, with possible exception, under Rev. St. 1925, art. 894, of one validated, authenticated, or certified, as provided in article 890, is not a true negotiable instrument, but assignee is presumed to have acquired it with knowledge that goods shipped may not conform to exact description therein, and that transportation contract will have been performed if goods received be transported and delivered or tendered "in like order and condition" (Rev. St. 1925, art. 885), and hence is chargeable with notice of shipper's wrongful procurement of bill falsely describing goods.

**5. Carriers ⊜⟿176—Connecting carrier is not absolutely responsible for mistaken recital in bill of lading issued by initial carrier (Rev. St. 1925, arts. 905, 906).**

Rev. St. 1925, arts. 905, 906, do not impress on connecting carrier absolute responsibility for mistaken recital in bill of lading issued by initial carrier, but relate to externally imposed agency in reference to goods actually shipped, contract referring to freight itself as received, even if "transportation" as used in statute includes final delivery.

**6. Carriers ⊜⟿52(2)—Part of bill of lading which is receipt is only prima facie evidence of what goods were delivered by shipper, and may be rebutted by proof of tender of goods in like order and condition as when received (Rev. St. 1925, arts. 905, 906).**

While part of bill of lading which is mere receipt is competent evidence of what goods were actually delivered by shipper, under Rev. St. 1925, arts. 905, 906, effect thereof is prima facie only, and may be rebutted by proof of tender of goods in like order and condition as when received from shipper.

**7. Carriers ⊜⟿176 — Connecting carrier held not negligent in failing promptly to discover that bales of cotton in locked car were not marked as indicated in bill of lading and not chargeable with initial carrier's original negligence.**

Where car, as loaded by shipper, sealed at point of shipment and thus received by connecting carrier, had nothing about it or in its billing to show that bales of cotton therein were not marked as indicated in bill of lading, or to arouse inquiry as to their markings, such carrier did not omit due care in failing promptly to discover mistake, nor become party to initial carrier's original negligence.

Error to Court of Civil Appeals, First Supreme Judicial District.

Action by I. H. Kempner and others, doing business in name of H. Kempner, against the Gulf, Colorado & Santa Fé Railway Company. Judgment for plaintiffs was affirmed by the Court of Civil Appeals (275 S. W. 459), and defendant brings error. Reversed and rendered.

Terry, Cavin & Mills, of Galveston, for plaintiff in error.

Williams, Neethe & Williams, of Galveston, for defendants in error.

NICKELS, J. A judgment allowing recovery of damages measured by decline in the market value of cotton subsequent to its arrival at point of destination and while it was being held by the railway company on account of doubt as to its ownership was affirmed by the honorable Court of Civil Appeals, First district (275 S. W. 459).

[1] The injury for which recovery was permitted was an immediate consequence of the terminal carrier's failure promptly to deliver cotton which, in fact, had been by it (and its "connecting carrier") "speedily and safely transported" (and "in like order and condition" as when received from the shipper) from origin to point of destination as required by articles 885, 905, and 906, R. S. 1925. The actual cotton, as thus transported, was unconditionally tendered to Kempner (who, as assignee, held a shipper's order bill of lading) on September 27, 1920, after it had arrived at Galveston on September 17th. Subsequent loss (in market value) is attributable to Kempner's refusal to accept that tender. Responsibility for previous loss (in market value) is admitted by the terminal carrier, and it seeks relief only as against the recovery for subsequent loss. Its claim to this relief is predicated upon asserted lack of pleading or proof to support Kempner's right to decline acceptance.

In respect to pleading, it seems to us that the answer supplied what the petition may have lacked in presenting the issue of mistake in the bill of lading as the ground of Kempner's refusal. Pope v. K. C., M. & O. Ry. Co., 207 S. W. 514, 109 Tex. 311, 322. Proof, on the issue, without dispute and as a matter of law, shows the tender was proper and its declination unwarranted. Hence, loss subsequent to September 27th is chargeable to Kempner and not to the carrier.

[2] Kempner had agreed to buy from Ramsey 25 bales of cotton, "middling basis," and

---

⊜⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

not otherwise described. Ramsey loaded the 25 bales into a car (furnished for the purpose by the initial carrier) at Edinburg, expressly relieving the carrier of that task. While the loading was in progress he told that carrier's agent that he (Ramsey) would mark each bale with the letters "LTB," and upon that representation and promise he procured from the agent a through shipper's order bill of lading correctly and sufficiently describing the cotton otherwise, but which, also, described the bales as being marked "LTB." This latter element of the description in the instrument was thereafter caused to become false by Ramsey's failure to keep his promise as to the marking of the bales. But for that promise and default the bill of lading, with the false description, would never have come into existence. After it was issued, and when it became false and subsequently, it was in Ramsey's possession and control, and all rights pertaining to it (and to the cotton itself) were his. Manifestly, he could not have taken advantage of his own wrong or have rightly declined the cotton if he had continued as owner and it had been tendered to him, as it was to his assignee, at Galveston. He would have been estopped, and, besides, his delinquency would have been the proximate cause of the situation then presented. M. P. Ry. Co. v. Weisman, 21 S. W. 426, 2 Tex. Civ. App. 86; G. H. & S. A. Ry. Co. v. Rutledge (Tex. Civ. App.) 37 S. W. 176; M., K. & T. Ry. Co. v. Wells, 54 S. W. 939, 22 Tex. Civ. App. 255; Texas Mexican Ry. Co. v. Reed, 121 S. W. 519, 56 Tex. Civ. App. 452; G. C. & S. F. Ry. Co. v. Persky (Tex. Civ. App.) 200 S. W. 606; Mo. Iron & Metal Co. v. T. & P. Ry. Co. (Tex. Civ. App.) 198 S. W. 1067. When the sale was completed at Galveston by transfer of the lading, Kempner took the place vacated by Ramsey; he bought what Ramsey had to sell and nothing more. He did not buy 25 bales of cotton marked "LTB," but he did purchase the 25 bales actually loaded by Ramsey along with Ramsey's broken promise and sequent inability to refuse that cotton when offered. His evidence of title was symbolic of what was actually shipped and not of what was not delivered for shipment. This is true, because a bill of lading (at least of the kind involved) has a double aspect. It is at once a receipt and a transportation contract. Pollard v. Vinton, 26 L. Ed. 998, 105 U. S. 7; Friedlander v. T. & P. Ry. Co., 9 S. Ct. 570, 130 U. S. 416, 32 L. Ed. 991.

[3] As a receipt for goods purportedly delivered for shipment it is open to explanation, modification, or contradiction through proof aliunde. Id. The reasons why it is so need not be detailed, but we call attention to one of them in the obvious fact that, else, a carrier would always have a convenient and lawful way in which to practice unjust discrimination and to add to the common rate burden elements which do not belong there.

Such is the common law, and in this respect (with a possible exception to be noted) the common law is not changed by, but is redeclared, in those statutes which treat goods as actually delivered for shipment (and as thence to be forwarded and delivered, "in like order and condition" [article 885, R. S. 1925]), as the basis of the transportation contract. The possible exception referred to is to be found in that portion of article 894, R. S. 1925, which declares an "incontestable" nature for a particular kind of lading—i. e., one which may have been "authenticated," "validated," or "certified" as provided for in article 890—and, thus, the statute recognizes a contestable nature for all others.

[4] It results, of course, that a bill of lading (with the possible exception of one which has been "validated," "authenticated," or "certified") is not, in a broad or true sense, a negotiable instrument. Shaw v. Railway Co., 101 U. S. 557, 25 L. Ed. 892; Pollard v. Vinton, supra; Iron Mountain Ry. Co. v. Knight, 7 S. Ct. 1132, 122 U. S. 79, 30 L. Ed. 1077; Friedlander v. T. & P. Ry. Co., supra; M. P. Ry. Co. v. McFadden, 14 S. Ct. 990, 154 U. S. 155, 38 L. Ed. 944; The Carlos F. Roses, 20 S. Ct. 803, 177 U. S. 655, 44 L. Ed. 929; A., T. & S. F. Ry. Co. v. Harold, 36 S. Ct. 665, 241 U. S. 371, 60 L. Ed. 1050. With the exception noted, the assignee is presumed to have acquired the lading with knowledge that the goods actually shipped may not conform to the exact description given in the instrument, and that the transportation contract and duties will have been performed if the goods actually received be transported and delivered (or tendered) "in like order and condition." Ex necessitate, he is chargeable with notice of the shipper's positive wrong in procuring a bill of lading which falsely describes the goods.

[5] Another consequence is that articles 905 and 906, R. S. 1925, do not impress upon a "connecting carrier" an absolute responsibility for a mistaken recital in a bill of lading issued by the initial carrier. Those statutes relate to an externally imposed agency in reference to goods actually shipped. That is to say, they pertain to duties owed as to "any freight" which may be received and transported. By receipt of that "freight" a "connecting carrier" gives operation to a statutory relation thus described: Each and all of the "connecting carriers" "shall be deemed and held to be under a contract with each other and with the shipper, owner, and consignee of such property for the safe and speedy transportation of such property from the point of shipment to destination." Perforce the terms of article 905, whatever may be in a lading inconsistent with the statutory "contract" is erased when the "freight" goes into possession of the (second) "connecting carrier." If it be true that "transportation," as used in the statute, includes final delivery (and about this we express no

*opinion*), it is, nevertheless, also true that the contract thus imposed has reference to the "freight" itself (i. e., "such property") as received, and not to imaginary "freight" or property of a different kind.

[6] The bill of lading, wherein it evidences a transportation contract as to goods as shipped, is that to which articles 905 and 906 give a "connecting carrier's" acquiescence and adoption. For reasons stated, neither the facts nor the statute impose upon the "connecting carrier" absolute obligations in respect to falsity in that part of the lading which is a mere "receipt." That part of the bill, it is true, is made competent evidence of what goods were actually delivered by the shipper; but the effect of the evidence is prima facie only—it may be rebutted because of general principles already stated and because the statute clearly so implies in that portion wherein it is said that the lading, etc., "shall constitute prima facie evidence of the subsistence of the relations, duties and liabilities of such carrier as herein provided."

The statutory agency imposed by articles 905 and 906 did not, in our opinion, include authority to misdescribe the property received at Edinburg, or, thus, make the terminal carrier a party to that act of negligence, except, at most, in a prima facie sense. The apparent and rebuttable effect is conclusively overthrown by proof of tender of the goods "in like order and condition" as when received from the shipper.

[7] And since the car (as loaded by Ramsey and sealed at Edinburg and as thus received by the Gulf, Colorado & Santa Fé Railway Company) had nothing about it (or in or about its billing) to show that the bales locked therein were not marked "LTB," or to arouse inquiry as to their markings, that carrier did no more omit due care in failing to discover the mistake earlier than was done or become a party to the original negligence than was done by the terminal carrier in the circumstances disclosed in G. W., T. & P. Ry. Co. v. Wittnebert, 108 S. W. 150, 101 Tex. 368, 374, 375, 14 L. R. A. (N. S.) 1227, 130 Am. St. Rep. 858, 16 Ann. Cas. 1153. Kempner occupied, it seems to us, a position analogous to that of the consignee in the case cited.

For aught that appears, therefore, the Gulf, Colorado & Santa Fé Railway Company performed its full duty by making tender on September 27th. If Kempner had a right to decline that offer it rested upon something not disclosed in pleading or proof.

The parties agree that the cotton was worth $3,258.29 on September 17th (i. e. date of arrival at Galveston) and $2,746.88 on September 27th.

We recommend reversal of the judgments of the district court and of the Court of Civil Appeals, and rendition of judgment in favor of defendants in error I. H. Kempner,

D. W. Kempner, R. Lee Kempner, S. E. Kempner, and Joseph Seinsheimer (doing business in the name of "H. Kempner"), and against plaintiff in error, Gulf, Colorado & Santa Fé Railway Company, for the sum of $511.31, with interest from September 17, 1920.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals reversed, and judgment rendered for defendant in error for $511.31, as recommended by the Commission of Appeals.