**HANSON v. PONDER et al. (No. 997–4866.)**

Commission of Appeals of Texas, Section A. Nov. 30, 1927.

**1. Carriers** ⬦⟜40—**Carrier owes shipper and consignee duty to supply cars and equipment reasonably suitable and safe for carriage and delivery of particular commodity.**

Common carrier owes shipper and consignee duty to supply cars and equipment reasonably

suitable and safe for carriage and delivery of particular sort of commodity offered for conveyance, with particular reference to final delivery thereof in same condition as on receipt.

**2. Railroads** ⬦⟜275(2) — **Consignee's employees, unloading cars, are carrier's "invitees," not trespassers or mere licensees.**

Contract of carriage, involving unloading at destination by consignee, contemplates right and probability of performance of such duty through employees, who are "invitees" of carrier, as well as of consignee, and not trespassers or mere licensees.

**3. Railroads** ⬦⟜275(4)—**Carrier must use ordinary care to prevent injury to consignee's agents through defective or insufficient equipment.**

Both initial and final carriers, and intermediate carriers with respect to equipment up to point of delivery to immediate successor, are charged by contract, as well as doctrine of reasonably safe premises for invitees, with use of ordinary care to prevent injury, through defective or insufficient equipment, to consignee and his agents in unloading cars.

**4. Railroads** ⬦⟜275(4)—**Standards holding logs in place on flat car are part of carrier's equipment, which must be reasonably safe for consignee's agents.**

Standards or other devices inserted by either consignor or initial carrier to hold logs in place on flat cars must be regarded as part of equipment, against injury through defects or insufficiency of which carrier must use ordinary care to protect consignee and his agents unloading logs.

**5. Evidence** ⬦⟜7—**There is no judicial knowledge of invincibility of pine saplings holding logs on flat cars.**

There is no judicial knowledge of such characteristics of pine saplings, used to hold logs in place on flat cars, as to justify fiat of invincibility precluding necessity of showing their holding strength.

**6. Negligence** ⬦⟜1—**Expert using best judgment may be negligent.**

That rules were met does not necessarily disprove negligence, as the "man on the spot," who makes or applies rules, may be an expert and use his best judgment, and yet be negligent.

**7. Railroads** ⬦⟜282(9)—**Failure to secure standards or load of logs, injuring consignee's employee unloading flat car, held for jury.**

Failure to secure standards holding logs in place or load itself to body of flat cars *held* for jury on evidence of slipping of standards, which it cannot be *held*, as matter of law, in action for injuries to consignee's employee unloading logs, did not result in impaired strength or otherwise prevent their adequacy.

**8. Railroads** ⬦⟜282(9)—**Observance of loading rule would be evidence for jury, that logs on flat car should have been loaded as required thereby.**

Existence of recognized loading rule and proof of conformity thereto would not inevitably disprove improper loading of logs on flat cars

with most of butts resting on most heavily taxed car, but its existence and claim of observance would be some evidence, sufficient to take question to jury, that load should have been made with large and small ends alternately in each tier as required by rule.

**9. Railroads ⚖══282(9)—Defects in standards holding logs on flat car or neglect to discover defects causing injury to consignee's employee held for jury.**

Original and continued inadequacy in quality or numbers of standards used to hold logs in place on flat cars, defective attachment thereof to bodies of cars, cracking or other weakening of standards enroute, or unjustified failure to discover their original inadequacy or subsequent impairment, *held* for jury, in action for injuries to consignee's employee while unloading cars.

**10. Railroads ⚖══282(9)—Proper inspection of load of logs on flat car, injuring consignee's employee, held for jury.**

Proper inspection of load of logs on flat cars at point of origin and various stages en route *held* for jury, in action for injuries to consignee's employee while unloading logs, in view of conflicting testimony as to adequacy of standards and bracing and "butt to top" loading.

**11. Railroad ⚖══282(9)—Whether carrier should have anticipated that consignee's agents would remove logs from flat cars in manner employed held for jury.**

Whether carriers of logs, alleged to have been improperly loaded on and secured to flat cars, should have anticipated that consignee's agents probably would mount load, sever and remove wires, and proceed to remove logs in manner employed *held* for jury, in action for resulting injuries to one of them.

**12. Railroads ⚖══282(9)—Carrier's negligence and proximate cause of injuries to consignee's agent by logs falling from flat car held for jury.**

Negligence of several carriers of logs in respect to manner of loading and original inadequacy and subsequent defects of holding devices, and proximate cause of injuries to consignee's agent by falling logs during unloading, *held* for jury.

**13. Master and servant ⚖══361—Consignee's employee, injured while unloading interstate shipment of logs, held not "carriers' employee," within federal statute (federal Employer's Liability Act [45 USCA §§ 51–59]; Workmen's Compensation Law Tex.).**

Employee of consignee having exclusive right to direct, and actually directing his movements in unloading logs from flat cars, was not an employee of carriers, within federal Employer's Liability Act (45 USCA §§ 51–59; U. S. Comp. St. §§ 8657–8665), so as to render Workmen's Compensation Law Tex. (Rev. St. 1925, arts. 8306–8309) inapplicable in his action against carriers for injuries sustained, though shipment had not lost its interstate character.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Employé.]

**14. Master and servant ⚖══354—Employee compensated by insurer, accepting judgment denying subrogation, may sue others than employer for injuries sustained (Rev. St. 1925, art. 8307, § 6a; Const. art. 12, § 6).**

Under Rev. St. 1925, art. 8307, § 6a, viewed in light of general purposes and nature of Workmen's Compensation Law and Const. art. 12, § 6, employee, compensated by insurer accepting judgment against it on its claim of subrogation, may sue others than employer for injuries caused by them.

**15. Master and servant ⚖══354—Express statutory declaration would be required to prevent injured employee, compensated by insurer not taking initiative, from suing third person (Rev. St. 1925, art. 8307, § 6a).**

A very plainly expressed declaration such as is not found in Rev. St. 1925, art. 8307, § 6a, would be required to prevent action against third person by injured employee compensated by insurer, where latter does not take initiative.

**16. Master and servant ⚖══354—Compensation paid consignee's injured employee by insurer should be deducted from damages recovered from carriers causing injuries (Rev. St. 1925, art 8307, § 6a).**

Amount of compensation paid consignee's injured employee by insurer, claiming right to subrogation under Rev. St. 1925, art. 8307, § 6a, should be deducted from amount of damages found by jury in rendering judgment on verdict for such employee against carriers causing injuries.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Action by Charles Hanson against A. R. Ponder, receiver of the San Antonio, Uvalde & Gulf Railway Company, and others. A judgment for defendants was affirmed by the Court of Civil Appeals (293 S. W. 219), and plaintiff brings error. Reversed and remanded in part, and affirmed in part.

James M. Taylor and E. B. Ward, both of of Corpus Christi, for plaintiff in error.

Kleberg & North and Boone & Savage, all of Corpus Christi, and Mason Williams, of San Antonio, for defendants in error.

NICKELS, J. Hanson sought recovery for personal injuries. A peremptory instruction against him was given and the judgment rendered upon a verdict in response was affirmed by the Court of Civil Appeals. 293 S. W. 219. Whether negligence and cause be issuable are amongst the basic questions here.

[1–3] Inter alia, common carrier obligations include the duty to supply such cars and equipment as may be reasonably suitable and safe for carriage and delivery of the particular sort of commodity offered for conveyance. 4 R. C. L. 682. That duty in its direct aspects is owed to the shipper and consignee and has particular reference to final delivery of the goods in the same con-

dition as upon receipt. Yet it may have other relations. If the contract involve unloading at destination by the consignee, there is in contemplation the right to perform that duty through employees and the probability that it will be thus performed. Hence rightful presence in or near the car of persons not having direct contract relation with the carrier is to be anticipated. Their presence is by invitation of the carrier no less than of the consignee; they are in no sense trespassers, and they are something more than mere licensees. 22 R. C. L. 929, 930. At least the initial carrier which furnishes the equipment either as true or special owner and the final carrier which by adoption makes the equipment its own and delegates to the consignee · but a partial control is charged with the use of ordinary care to prevent injury to the consignee and his agents through defective or insufficient equipment. That, we think, is incident to the contractual duty, as well as being included in the doctrine of reasonably safe premises for invitees. The same rule of substantive law is applicable, we think, to intermediate carriers and with respect to the equipment up to the point of delivery to an immediate successor.

The differences in the situation of the various carriers has reference to the means of knowledge, and, therefore, to the proof rather than to the standard of conduct.

[4] Two flat cars coupled together (as a "twin-car") were used as means of conveyance. The lading consisted of 53 logs (each 50 to 55 feet long, averaging 18 inches in diameter and weighing from 2,000 to 4,000 pounds) so placed on the "twin-car" as to compose a mass about 55 feet long, 8 feet high, 10 or 12 feet wide, with much the larger part resting upon one of the cars. The weight of the mass ranged between 106,000 to 212,000 pounds. To hold it in place two pine saplings (from 4½ to 7 inches in diameter according to various estimates) were inserted in brackets fastened to each side of each of the two cars. Those standards were not otherwise attached to the bodies of the cars so as to prevent upward shifting and possible resultant weakening or escape. Each standard was attached to its correspondent across the car by three strands of wire (about the size of a "three penny nail") "twisted together" at each of three positions, viz., between the bottom tier and the one next following, between the third and fourth tiers (from the bottom of the car) and immediately above the top tier. The cars, thus loaded, were to be transported several hundreds of miles, and with such switching at least as would be necessary to interchange as between five carriers.

The standards, or devices answering their purpose, whether inserted by the consignor or the initial carrier, must be regarded as a part of the equipment, for, manifestly, the commodity tendered by the consignor and accepted by the carriers was not subject to transportation and delivery without them. That it was so regarded, in point of fact, is shown by the testimony (that of Court and Stauder, for example) which exhibits special "loading rules" prescribed by the American Railway Association, Mechanical Department, for observance by the shipper (who loads) and the carrier and which deal with the matter of standards in such manner as to require the carrier to reject a "load" and to set it back for "readjustment" if proper standards, bracing, etc., do not appear, as also by the testimony of most (if not all) of the "inspectors" and conductors of the various railway companies to the general effect that their duties in respect to such shipments included special attention to standards and bracing and position of the "load."

[5] If no more than what has been stated were shown, it could not be said, as a matter of law, that the "twin-car" was sufficiently or properly equipped, even though it be true that numerous inspections were made between points of origin and destination and those who made them pronounced the cars and equipment and "load" in good and proper condition. Such reports of actual inspections would (in touching sufficiency of equipment) be no more than conclusions against whose probative force there would arise such inferences as may be predicated in the great weight of the "load" and its inevitable tendencies to shift en masse as well as by parts, in response to the movements and shocks to which the cars were subject. The holding strength of the eight pine saplings, as used, is not shown, and there is for them in judicial knowledge no such characteristics as to justify a fiat of invincibility. Photographs of the cars in evidence exhibit many unfilled brackets, and, for aught that appears, additional standards or additional bracing could have been used without undue burden.

[6] But in respect to that subject there is the testimony of Kelly, a man apparently qualified to have and to express an opinion, to the effect that there ought to have been sufficient standards wired together crosswise between each tier of logs. If it be said that the rules were met, it remains true that the rules might be insufficient, for the "man on the spot," who makes or applies rules, may be an expert and use his best judgment and yet be negligent. The Germanic, 196 U. S. 589, 25 S. Ct. 317, 49 L. Ed. 610. If the rules made a certain prescription and it was observed, that would but present a difference in judgment as between those who compiled the rules and Mr. Kelly.

[7] The standards used were (as indicated) merely set into the brackets. There is testimony (that of Anderson, "car foreman" for the final carrier) that they were "tapered" at the lower ends so as to fit the brackets. It might be assumed, we think, that swaying

of the cars and "load" in movement might well be expected to loosen the standards and give them a tendency to escape the sockets. Anderson remarked, "It is very often the case that the stakes" (holding loads of piling in place) "slip up," and that "the only practical way he had ever known to hold the stakes down", was by means of rods placed "up against the bottom of the load" and run (crosswise) through each pair of stakes. Kelly said that, in order to prevent "jumping up and down and sideways," the "load," if not the stakes, ought to be fastened to the bottom of the car. When the shipment reached Pleasanton 30 miles from San Antonio in the direction of Corpus Christi, Anderson discovered that two of the standards (on one side of one of the cars) had slipped upward "one and a half or two inches" from their original positions. One of the things which attracted his attention was the fact that the wires higher up on these standards had cut downward, "at an angle," through the "coarse bark" of the saplings. The standards were not driven back to original positions, but Anderson inserted two rods in the manner indicated by him as the "only practical way to hold the stakes down" in order to prevent further slipping during the remainder of the transportation to Corpus Christi. It cannot be ruled, as a matter of law, that such slipping of standards would not result in impaired strength or otherwise prevent their adequacy for the purposes used. Hence there is an issue about failure to secure the standards or the "load" itself to the body of the cars.

[8] The "loading rules" mentioned require that piling be placed "butt to top and top to butt"; that is, alternation in each tier of large ends and small ends. Manifestly, the purpose is to secure, so far as possible, an evenly balanced mass. And that design, in part at least, has relation to the character, number, strength, and bracing of the standards or other holding devices. Inspectors for the consignor and initial carrier testified that this "load" was so placed; yet there is in the testimony of Kelly and that of Cook, witnesses for the plaintiff, statements which might properly be taken by a trier of facts as showing that "butts" very greatly preponderated in that part of the "load" which rested upon the most heavily taxed car. Existence of a recognized rule and proof of conformity would not inevitably disprove improper loading in this respect, but its existence and the claim of observance would be some evidence that, in fact, the "load" ought to have been made that way. And the testimony of Kelly and Cook is some evidence of failure to do what ought to have been done.

[9] The "twin-car" was set on the spur track in the forenoon, and its unloading was undertaken about noon of the same day. The cross wires above the top of the "load" were cut and the standards on one side of the cars were cut at a point near the bottom of the top tier of logs. The cross wires immediately above the bottom tier, at least, were left intact. Hanson and other employees of the consignee were upon the "load" using cant hooks to roll piling from the car. Six logs had been thus removed. As the seventh was being moved, each of the standards on one side of each of the cars parted at the top of its bracket, and the logs began to roll off the cars at that side and from the bottom of the load. That movement was very swift, and it continued until from one-half to two-thirds of the "load" escaped. Hanson and others went down with the piling; he was seriously injured, and the others were killed. That portion of the "load" which remained on the cars was four tiers high next to the standards on the opposite side (which remained intact), and some five or six logs wide at the bottom, and three or four wide at the top. Photographs of the cars, etc., were taken soon after and were put in evidence by the defendants. Amongst other things, they appear to disclose the following: A part of one of the broken standards was left attached to what appears to be one of the rods which Anderson had placed, and the rod appears to extend outward and downward from the edge of the car floor a foot or more in such position as to indicate that it had been loosened from its anchorage across the car; what appears to be the end of another of those rods is to be seen near the bracket of another of the broken standards, but it is shown as free of any part of the standard, and a juror might properly conclude that Anderson failed to attach the nut, that the nut had in some way become loosened and removed, or that the outward pressure of the logs was great enough to force the nut (or the head) of the rod through the standard.

The direction and nature of the movement of the logs when the standards broke, the points of breakage (in view of upper bracing), the fact that all of the standards across the cars remained intact, and the situation in which the rods were left are not without corroborative significance in respect either to original and continued inadequacy (in quality or numbers) of the standards, defective attachment to the bodies of the cars, a cracked or otherwise weakened condition of the standards suffered en route (maybe, in making the holes for the rods), or unjustified failure to discover original inadequacy or impairment of equipment originally or en route.

[10] Testimony was produced by the defendants which, for present purposes, may be taken as showing: (a) Usual inspection by consignor and carrier at point of origin and by each succeeding carrier and at various

stages of the movement down to the Y in Corpus Christi; (b) with the exception noted at Pleasanton, the equipment and "load" appeared to the inspectors as being proper and in good condition. Yet that testimony is affected by various things: In respect to adequacy of standards and bracing, individual judgment was expressed, which, as shown, is opposed by the judgment of Kelly, a witness for plaintiff, as to the amount of cross bracing, and by the judgment of Kelly and that of Anderson, "car foreman" of the final carrier, as to downward bracing; and on the side of Kelly, in the one instance, and of Kelly and Anderson, in the other, there is some corroboration in the weight, dimensions, and position of the "load" as viewed with the various movements and forces to which the cars and "load" were inevitably subjected en route. With reference to "butt to top" loading, so as to have balance, there is, as noted, conflict between Kelly and Cook on the one hand, and Court and Stauder on the other. The shipment had moved many hundreds of miles and had been subjected to much switching before it left San Antonio; at Pleasanton, 30 miles further on, it was discovered that the stakes had slipped upward and, as one result, the cross wires had cut downward through the bark; nothing appears to explain that thing as having occurred between San Antonio and Pleasanton, except the testimony of inspectors to the effect that nothing like that had been noticed. but it may have previously occurred and been overlooked, and a juror would not be bound to give opposing testimony that effect which would conclusively establish proper inspections. Apparently, too, in usual course the cars and "load" would have been given examination by the regular "car inspector" at Corpus Christi before delivery to the consignee; this was omitted because the cars were set for unloading before the inspector got to them; upon examination he might have discovered perils and have remedied or warned against the conditions. At all times, the equipment and loading could be observed and the real conditions, whatever they were, could be discovered from the outside. And these things, we think, make rightful inspection issuable.

[11] The nature of the commodity and its position on the cars were such as to import a thought that the consignee's agents probably would mount the "load" and sever and remove the wires (on top at least) and proceed to remove the logs in the manner actually employed. That such presence and conduct is not within anticipation imputed to the carriers cannot be ruled, as a matter of law, with evidence such as has been stated in the record.

[12] Each carrier had an interest in the entire movement and final delivery. In the physical sense, too, each had its part in final-

ly bringing the "load" and equipment to the locus in quo and in thus subjecting Hanson to whatever peril lurked in the cars, "load," and holding devices at the beginning of the movement. If defects occurred later, the carrier on whose lines that happened, and each subsequent one, likewise contributed to the final condition. The delivering carrier and two intermediate ones are defendants, and the negligence charged is in the pleading attributed to each and all of them. And for the reasons stated, we hold that negligence and proximate cause are issuable. Vide authorities reported and collated at page 857 et seq., 9 L. R. A. (N. S.), and at pages 123–129, 41 A. L. R.

Because the thing which produced the injury on account of which suit was brought in G., W. T. & P. Ry. Co. v. Wittnebert, 101 Tex. 368, 108 S. W. 150, 14 L. R. A. (N. S.) 1227, 130 Am. St. Rep. 858, 16 Ann. Cas. 1153, and in K. C., M. & O. Ry. Co. v. Pysher (Tex. Civ. App.) 195 S. W. 981 (see, too, G., C. & S. F. Ry. Co. v. Kempner [Tex. Com. App.] 282 S. W. 795), was hidden inside closed cars (received from connecting carriers) and could not have been discovered by external examinations, and because there was not in external appearances anything to excite inquiry about what might be inside, it was ruled in each case that the final carrier was not liable for personal injury to the consignee (in the first case, and to the agent of the consignee in the second case) or, in the third case, for loss incident to delay in delivery of goods immediately caused by misdescription in the bill of lading. The decisions in those cases, viewed with the bases therefor, imply the duties and liabilities in respect to which we hold there is support in the present case.

It will be understood, of course, that proximate causation attributable to acts done or omitted by others than the carriers after the "shipment" arrived at Corpus Christi is not affected by anything said herein.

[13] We have not considered the matters of negligence as averred against Sumner-Sollitt Company, consignee, for the reason that we believe the peremptory instruction separately requested by it was properly given on grounds to be stated.

That company pleaded and proved its status of "subscriber" under the Workmen's Compensation Law (title 130, R. S. 1925), proper reports of the injury, and adjustment of compensation therefor and payments (weekly for a while, and in final "lump sum") to Hansen by the "insurer." Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517.

Hanson suggests that he was, in effect, an employee of the railway companies and subject to the federal Employer's Liability Law (45 USCA §§ 51–59; U. S. Comp. St. §§ 8657–8665), and was, in fact and law, himself engaged in interstate commerce because the shipment which was being unloaded still had

the interstate character; because of these things, he says, the Workmen's Compensation Law has no application. But if it have applicability, he says, it is unconstitutional.

The latter suggestion is foreclosed by previous decisions. Middleton v. Texas Power & Light Co., 108 Tex. 96, 185 S. W. 556; s. c., 249 U. S. 152, 39 S. Ct. 227, 63 L. Ed. 527.

The proof and his averments show that he was an employee of Sumner Sollitt Company, who had the exclusive right to direct and who directed his employee movements, and that perforce, he was not an employee of the carriers, within the meaning of the federal Employer's Liability Act. Robinson v. B. & O. Ry. Co., 237 U. S. 84, 35 S. Ct. 491, 59 L. Ed. 849; I. C. Ry. Co. v. Johnston, 205 Ala. 1, 87 So. 866; s. c., 254 U. S. 654, 41 S. Ct. 218, 65 L. Ed. 459; Frazier v. Hines (D. C.) 260 F. 879; Bay v. Merrill & Ring Lbr. Co. (D. C.) 211 F. 717, 718; Chicago, etc., Ry. Co. v. Bond, 240 U. S. 449, 36 S. Ct. 403, 60 L. Ed. 735. In view of this, the fact that the shipment itself had not lost its interstate character, if that be a fact, is not important.

The "insurer," United States Fidelity & Guaranty Company, intervened and claimed its right to subrogation. Article 8307, R. S. 1925, § 6a. Judgment was rendered against it, but it did not appeal.

[14, 15] The situation thus presented, however, left Hanson free to prosecute his claims against the carriers. There is to be found in section 6a, art. 8307, R. S. 1925, some language of different import, if separately considered; but when the entire section is viewed in the light of the general purposes and nature of the Workmen's Compensation Law, we believe the right persists. In that section it is declared that original election "to proceed at law against" a person not a party to the insurance arrangement shall cut off the right to "compensation under this law," but there is no comparable declaration about the effect of an original claim of compensation. Compare the language of the two clauses of section 6, art. 12, of the Constitution, and the particular effect produced by the affirmative declaration that fictitious stock shall be "void." Washer v. Smyer, 109 Tex. 398, 404–410, 211 S. W. 985, 4 A. L. R. 1320. If compensation be claimed, it is declared that the

insurer "shall be subrogated to the rights of the injured employee in so far as may be necessary and may enforce" the same "in the name of the injured employee," etc., "and for the joint use and benefit of said employee or beneficiaries and" the insurer, but a compromise shall not be made "without notice to the injured employee," etc. The language just mentioned imports a continuing right in the compensated employee as against persons other than the employer, and the words giving the insurer the right to bring suit are permissive in form. It would require a very plainly expressed declaration to prevent action against a third person by an injured employee in a case where the insurer does not take the initiative, and such a declaration we do not find. Fox v. Dallas Hotel Co., supra. If the employee acted too quickly here, the insurer, nevertheless, intervened and merely claimed the right to subrogation; it did not claim the right further to control the suit; and it has accepted a judgment against it upon the claim to subrogation.

[16] In this situation, if Hanson secures a verdict, the court, in rendering judgment, should deduct from the amount of damages found by the jury the amount of "compensation" paid.

We recommend that the judgments of the district court and Court of Civil Appeals as between Charles Hanson, plaintiff in error, and Morgan's Louisiana & Texas Railway & Steamship Company, Galveston, Harrisburg & San Antonio Railway Company, San Antonio, Uvalde & Gulf Railway Company, and A. R. Ponder, its receiver, defendants in error, be reversed, that the cause as between those parties be remanded, and that in all other respects said judgments be affirmed. Whatever costs have been incurred by Sumner-Sollitt Company, defendant in error, should be assessed against Charles Hanson, plaintiff in error, and the balance against the defendants in error first named above.

CURETON, C. J. The judgments of the district court and Court of Civil Appeals are reversed as to carriers, and the cause is remanded to the district court as between them and plaintiff in error, and said judgments in all other respects are affirmed, as recommended by the Commission of Appeals.