## SCHNICK v. MORRIS et al.  (No. 1904.)

Court of Civil Appeals of Texas.  Beaumont. Dec. 18, 1929.

Rehearing Denied Jan. 15, 1930.

E. C. Gaines, of Austin, and W. J. Brown and Chas. D. Smith, both of Beaumont, for appellant.

Howth, Adams & Hart and Howell & Howell, all of Beaumont, for appellees.

O'QUINN, J. Morris sued Schnick and the Beaumont Bakery Company, a corporation, for damages growing out of a collision between the motorcycle on which he was riding and an automobile driven by William Schnick, Jr., son of defendant William Schnick.

For cause of action plaintiff alleged that on June 22, 1926, while operating his motorcycle on Park street in the city of Beaumont, Tex., and while operating same carefully and at a proper distance behind an automobile going in the same direction as he was traveling, said automobile being then and there owned by the defendants William Schnick and the Beaumont Bakery Company, and which was then being operated by the defendant's duly authorized agent, William Schnick, Jr., said automobile, which was just ahead of plaintiff, was negligently and suddenly turned and driven to the left across said Park street at about the middle of the block, thereby causing said automobile to violently collide with plaintiff's motorcycle, directly and proximately causing the injuries of which he complained; that said automobile was owned either jointly by said defendants, or by one of them, and was being operated by William Schnick, Jr., son of defendant William Schnick, with the consent of said William Schnick, in the furtherance of said William Schnick's business, or, in the alternative, was being operated by said William Schnick, Jr., as the agent of the said Beaumont Bakery Company, and in the furtherance of its business.

The acts of negligence alleged on the part of defendants were:

(a) Negligence of said William Schnick, Jr., agent of defendants operating said automobile, in carelessly and negligently and suddenly, and without warning to those traveling behind said automobile, turning said car to the left directly across the street in front

of plaintiff's motorcycle, thereby occasioning said collision, and rendering it impossible to prevent a collision between said automobile and plaintiff's motorcycle;

(b) Negligence on the part of the driver of said automobile in failing to give any signal, such as was reasonable and in compliance with the law of the road and the ordinances of the city of Beaumont, before turning to the left to cross the street in the middle of the block, as charged;

(c) Negligence in suddenly turning the automobile from the right-hand side of Park street and driving same to the left-hand side across said street between the intersections of said street with Emmett and Austin streets, instead of proceeding northward to the intersection of Park street and Austin street and then making such left-hand turn;

(d) Negligence in that said defendants, jointly and separately, in the manner charged in sections (a), (b), and (c), mentioned above, violated a certain ordinance of the city of Beaumont then and there in full force and effect, by reason of which they were guilty of negligence as a matter of law;

(e) Negligence in that said defendants, in the matters alleged in sections (a), (b), and (c), violated the provisions of an ordinance of the city of Beaumont, which required a person in charge of a vehicle desiring to make a left turn or change the course or speed, shall make same known by giving signal with his hand, in that the driver of the automobile in question failed, when making a left-hand turn and changing the course and speed of the said car, to give proper signal, as required by said ordinance, and said failure was negligence per se;

(f) That the matters alleged in the preceding sections constituted common-law negligence; and,

(g) Negligence in that the place where the collision occurred was within the corporate limits of the city of Beaumont, and was a place where there was constant travel by automobiles and otherwise by the public at all times, and that such travel was so intensive as to render it proper and necessary for the driver of a motor vehicle not to turn in the middle of the block, but to proceed to the next street crossing, as required by the city ordinance alleged, and, further, should necessity arise for one operating a motor vehicle to turn to the left in the middle of the block, the driver of said vehicle should exercise great care before beginning to make such turn to give such signals to those approaching from behind as that they could see and understand that a turn to the left was being made and avoid a collision, and the failure of the driver of the automobile in question to give said signals, or if given, to give them in time for the drivers of vehicles behind to slow up and avoid a collision, was negligence, and the proximate cause of the injury.

Defendants answered by plea in abatement, to the effect that plaintiff, at the time of the injury, was covered by compensation insurance carried by the Ocean Accident & Guaranty Corporation, Limited, and that plaintiff had claimed and accepted payment by said insurer for his injuries, and that said insurer was thus subrogated to the primary right to bring suit for damages growing out of said collision, and that plaintiff could not institute suit for said damages solely in his own name without reference to said insurer or its rights, and that, as plaintiff's pleading in no way referred to said insurer or its rights, or provided any relief or protection to it whatever, plaintiff's suit should be abated. This plea was overruled, and defendants then answered by general demurrer, several special exceptions, the two years' statute of limitations, a general denial, and plea of contributory negligence on the part of plaintiff.

Among the matters pleaded by defendant relative to its plea in abatement was the following:

"If these defendants could be mistaken in the fact that said suit is forever barred, then it appearing that said insurance company has paid compensation in the sum of about $1390.00, said company would be subrogated to the rights of plaintiff and a primary right to sue for damages herein would lie in said insurance company and could not be exercised by this plaintiff unless and until it appears that facts exist which would authorize the plaintiff to file such suit."

"It further appearing that said insurance company has paid said compensation, it follows as a matter of law that said company becomes subrogated to all rights of this plaintiff to the extent of all compensation paid or to be paid and to all expenses of collecting same, in the aggregate sum of about $2000.00, and said company is, therefore, a joint owner of any cause of action that might exist against these defendants, and this suit cannot proceed by plaintiff alone unless and until said insurance company is made a party to this suit so that any right it may have may be adjudicated."

The court overruled the plea in abatement and the several exceptions. The Ocean Accident & Guaranty Corporation, Limited, the compensation insurance carrier, mentioned by defendant, appeared by counsel and requested permission to intervene in the suit, to which defendant objected, which objection was overruled and the intervention granted.

The trial was to a jury upon special issues, in their answers to which the jury acquitted plaintiff of contributory negligence, and found in favor of plaintiff on the issues of negligence by defendant causing the collision,

and awarded plaintiff damages in the sum of $7,500. Judgment was accordingly entered. Motion for a new trial was overruled, and the case is before us on appeal.

There were no exceptions to the court's charge, nor any special charges or issues requested to be given, or submitted.

■ Appellant's first proposition that under the evidence appellee was "clearly guilty of contributory negligence," and therefore the judgment should not be permitted to stand, is overruled. Whether appellee was guilty of contributory negligence was a question of fact, and the state of the evidence is not such that the minds of reasonable men would not differ in arriving at a conclusion thereon. The question was submitted to the jury, and they acquitted appellee of contributory negligence, and we think there is ample evidence to support the finding.

The second proposition complains that the evidence is not sufficient to support the verdict of the jury in finding appellant guilty of negligence. This proposition is overruled. The jury's verdict has support in the record.

The third proposition urges that the damages assessed by the jury is excessive, out of proportion to the injuries shown, and should be set aside. The main injury shown was to the right heel. The injury occurred on June 22, 1926. The case was tried February 28, 1929. At that time the injury had not healed, but was still causing much suffering, although several doctors had treated it and there had been at least three attempts to graft new skin over the wound.

Morris testified: "I suffered an injury to my right heel in this accident. It raked the meat entirely off of the right heel nearly. It was just hanging on by a little meat. It pulled the entire heel off nearly. All that was holding the heel on was a little piece of meat. I was also bruised in my stomach. It hurt my head and the left side of my face. The heel of my right foot is still disabled. I can't walk on that foot very much at this time. I can walk on it a certain length of time and it pains me quite a bit and I have to rest. I am not able to work on that foot. I have not been able to do any manner of work since this accident. I have tried to get employment since this accident. I have not been able to get any employment since I was hurt. I was refused employment on account of my foot. I joined the army. I believe I was in the army a month and one day. I was discharged out of the army. I was discharged on account of being disabled. I was given a disabled discharge. I don't know exactly when it was that I joined the army. It has been so long ago that I couldn't say exactly when it was that I went into the army. I joined the army after I received this injury. While I was in the army I was not able to do any drilling or walking. I

spent the greater portion of my time, while I was in the army, in the station hospital. I remained in the hospital in the army for about three weeks and a half of the time that I was in the army. They treated me for this injury to my foot while I was in the hospital. They treated me for this heel injury while I was in the army hospital. I had several doctors to treat me for this injury to my heel. Dr. Burgess and Dr. Pedigo treated it one time and then Dr. Taylor in Houston treated it for me. Dr. Wier also treated my foot and made an examination of it. This foot and leg pains me a whole lot all the time. This foot and leg hurts me all the time nearly. When there is to be a change of weather it pains me most. Whenever I do any walking on it or stand on it any it hurts also. It hurts me nearly all the time; there is not much difference. This foot causes me a good deal of pain and suffering."

He further testified: "I will take off my shoe and show my foot to the jury. I have it bandaged up. I don't know whether it is broken down or not, I haven't looked at it in the last few days. I will have to take the bandages off of it in order to show it to the jury. I have the bandages off now. I will stand up here and put my foot where the jury can see it. That is all the motion I have of that foot. When I move that foot up and down like this, in this manner, it causes me pain right through here (indicating). Yes sir, it causes pain right through here. The skin graft was made right there (indicating). This is the skin graft here. I have had three skin grafts made on my heel. Yes sir, I mean that there has been three skin grafts made on my heel. Dr. Taylor did two of those grafts, and Dr. Burgess and Dr. Pedigo did the other one. Dr. Taylor made two of them in Houston, Texas, and the other one was made here in Beaumont, Texas. This part here is the skin graft. Whenever I try to walk very much all of this breaks down. I don't have the full use of my foot as it is now. When I walk or stand on it any it gets stiff all in here. It pains me all the time."

Dr. Wier, among other things, testified: "The foot that I examined had an injury to the heel. When I examined the heel I found that it had been injured and there had been some skin grafts made on the heel, but the most of the heel was occupied by scar tissue. Most anything might cause the injury to the heel that I saw. Usually it takes a tear of some kind to produce an injury of that kind. Yes, it would take a traumatic injury to the heel to produce the kind of injury that I found on my examination. He had had an injury of some kind to the heel. The fleshy part of the heel had been torn loose from the foot. It was the fleshy part of the heel, or rather the thick part of the heel, that had been torn loose from the bones of the foot. The skin had been torn loose from the bones

of the foot. The skin had been torn also. I don't know exactly how thick the fleshy part of the foot is exactly, but I would imagine that it is something like half an inch thick. I found scar tissue on the heel. I also found where a skin graft had been done on the heel. That skin graft did not cover the entire heel. The skin graft that I found which had taken was something about the size of a half a dollar. It may have been a little larger than that, and the rest of the heel was occupied by that scar tissue. I will explain to the jury what scar tissue is, and how it is formed. Scar tissue is usually due to a slow healing of a wound. In other words, if you have an injury or wound, when it heals up it will leave a certain amount of scar tissue which was formed when the wound healed. Scar tissue is caused by poor blood supply. In other words, the blood supply in the scar tissue is very poor. The skin will grow over the scar tissue and the blood supply is very poor and it is not nourished, due to that poor blood supply, that is why the scar tissue is thick. I would judge that the scar tissue on this young man's foot is probably ⅜ or ½ inch thick. There is usually more scar tissue the greater the injury. The more injury you have the more scar tissue you have. The more scar tissue you have on that heel the more disability will result from it. There is a great deal of scar tissue on that young man's foot. The heel has a great deal of scar tissue. The scar tissue occupies both sides of the heel and extends back to the limits of the skin graft. The scar tissue looks very thick. I would judge that the scar tissue is probably ⅜ or ½ an inch thick. You can't see through that scar tissue but you can tell that it is very thick. I would say that the scar tissue occupies all the space that was formerly occupied by healthy flesh. It is my opinion that that scar tissue was caused by some traumatic injury to the heel. That scar tissue is not as good as good healthy flesh. The blood supply is very poor to that scar tissue. That scar tissue is thick but it is not as good and strong and healthy as flesh. That scar tissue is liable to break down any time. Scar tissue is very easily injured because of its poor blood supply. In view of the fact that his heel contains that scar tissue, it is my opinion that it will cause him pain and he will be unable to stand or walk on it very much. If he were to walk on that foot very much the scar tissue is liable to break down. That scar tissue may be painful if he walks or stands on his foot—it usually is. Usually there is pain and suffering when you have very much scar tissue. I would expect pain in walking under those conditions. * * * I believe that the skin would break down over that scar tissue. I think that this man does have some disability on account of this injury and scar tissue. I think he is disabled to some extent where he has to stand on his

feet to do work. That injury to his heel will cause him some disability sooner or later where he has to stand or walk on his feet to perform his work. In other words if he stood on his feet or walked on his feet sooner or later the skin would break down over the scar tissue and cause him disability. I don't know how long it would require to do that, but sooner or later it would break down the skin over that scar tissue and it would cause him pain. If the scar tissue would break down then he would have to lay up for several months in order to let it grow back together. I am not able to say how long he could walk or how long he could stand on that foot without breaking down the skin over the scar tissue; neither am I able to say how long he could walk or stand on that foot without causing pain and causing a breaking down of the tissue. It is the usual thing for those things to break down with use. As to just how long it would take this to break down I am not able to say; neither am I able to say how long he would have to lay up off of his feet for it to grow back in order that he would be able to walk again. I am of the opinion that it would take longer to heal up than it would to break it down. I don't know how long it would take it to break down. It may break down in a day or two, then again it may break down in a week or a month; it may break down in a day or two and then it may take several weeks or months for it to heal up again. Of course, after a breaking down of those tissues there couldn't be any standing nor walking on the foot again until it had healed up again. After the tissues broke down he would have to lay up in bed and stay off his feet so as to enable it to heal up again. * * * In the plaintiff's present condition, it is my opinion that he is unable to perform manual labor requiring the use of his feet or walking or standing on them. I don't believe that he could hold a job."

Dr. Burgess testified:

"I saw this boy the first time on June 28, 1926; that was just after he was injured. When I saw him he had had an injury to his heel. The flesh had been torn loose from the bone. I did not cut that flesh off—I sewed it back on. According to my records he came to my office 119 times, and I went to his home to see him 69 times, and I saw him 25 times at the hospital. When I first saw him, I gave him an anesthetic once. All told that would make 213 visits that I saw him. I probably saw him many more times while he was in the hospital that I did not put down. I may have been out there to see other patients and just dropped in to see him. Yes sir, I said I also gave him an anesthetic one time in addition to the visits I made. The anesthetic was for the purpose of performing the operation on his heel. When he was first injured I believe Dr. S. D. Granata saw him. He saw him when he was first injured I believe. I

took charge of the case after that, and on or about October 5, I believe it was, Dr. Pedigo did a skin graft. I gave the anesthetic at that time myself while Dr. Pedigo did the grafting. I understand that there has been three attempts to graft new skin on his heel and foot. Two of those were made in Houston and one here I believe. Dr. Pedigo and I did one. Two were done in Houston, so I understand. I don't know what Dr. Pedigo's bill was but my bill was $411.00, I believe."

"I believe I treated this boy's foot for something over a year. During all of that time I believe that he was unable to perform any kind of labor. I don't think he could have worked at anything whatever during that time. As I understand it, he depended on manual labor for a living. To my knowledge he does not have any special calling. At that time any work that required walking or standing on his feet could not have been done by this boy. That is correct, he was not able to perform any kind of manual labor at that time. He couldn't have stood on his feet to do it at that time. The heel was sore during the time I treated it, and it never was entirely healed over at all during that time. That heel was sore for more than a year. When I discontinued the treatments the wound had nearly healed up; it hadn't entirely healed. It had nearly healed. The last time I saw him the scar tissue was forming on the portion of the heel. I regarded that as a process of healing. I would not expect to find a mass of scar tissue over all the entire injured part after a skin graft. There is bound to be scar tissue on any wound of that kind. When the flesh and muscles are injured and torn, you naturally expect scar tissue to form; there is nothing much there except skin and the tissues. The blood circulation through scar tissue is very poor. Yes, the circulation is very poor. I will admit that where scar tissue has formed on the heel that standing on the foot or walking on it would be more apt to break down than the tissues around normal flesh. I can't say that there would be pain. I can't say about the pain. The pain is purely for the man himself to tell about. A doctor can't tell whether a man is in pain or not. Very frequently a doctor has to take a man's word about whether he is suffering pain or not. The patient knows whether anything is giving him pain or not. The patient knows better than anybody whether a thing is hurting him or not. I can't say that man can't endure pain. If I had an injury and it was giving me pain I would not try to work. If I had an injury to my foot and standing or walking on it would hurt me I don't think I would try to use it. I wouldn't try to stand or walk on it I know unless I had to. I certainly wouldn't ordinarily, but that is largely a question of whether you have to do a thing or not. I don't think it is within the human power to perform labor eight or ten hours a day when in constant terrific pain. I know that a man can't work when it causes him excruciating pain, however, that would depend upon the extent of the pain. I can't answer that question. I don't know whether this young man is permanently injured or not. I don't know anything about the man's foot at this time because it is like I said, I haven't seen him in a year and a quarter; he might be permanently injured so far as I know. * * * If it is a fact that there now exists a spot about as big as a half dollar of the grafted skin that took, I don't know what to say about that. The two previous efforts to graft skin on his heel had failed but the last one looked like a success to me. I didn't see the second operation. The first skin graft that we done was what we called 'Thiersch,' some such word as that, just a thin layer of the skin taken off and laid over the wound and that was not a success because the granulation was poor, but as I understand it the second and third operation they took the whole thing off and took the skin and sewed one end down and let it stay there until it grew at that end so that it would have a good blood supply and then they took the other end and pulled it over the wound and sewed it down. That operation looked like a success. Any portion of the scar tissue on which new skin has been grafted will remain sore to the touch. The object of grafting new skin on that heel is to try and cover the raw surface. There was a raw surface there. It was an open wound there that we were trying to cover with that skin. There may have been some scar tissue at the bottom of it but the wound itself was open and the raw surface there wasn't anything on it. I do not consider a place with scar tissue over it as good as it was before the wound was inflicted. The difference is this, there is bound to be a certain amount of scar tissue, and scar tissue is not as strong and tough as the original skin, it is tender, and that scar tissue is more subject to future injury, that is all. That scar tissue is more apt to become tender with use. I wouldn't say for sure that scar tissue would become sore and raw with walking or standing. I said it is more apt to become tender than the original skin. I wouldn't say that it would absolutely become sore and tender with use, I said it might. As to whether the scar tissue would become sore and tender by walking and standing on it, would depend on the extent that it is walked or stood on. A man walking and standing on his feet doing hard manual labor, and his heel is covered with scar tissue, I would say that his heel is apt to become sore and raw. It probably would under those circumstances. I don't know that any portion of the heel that was covered with scar tissue, touches the ground or comes in contact with the ground, or that touches the shoe, it is liable to become sore and raw."

■ As before stated, the injury occurred on June 22, 1926. The case was tried February 28, 1929. At that time the injury had not healed, but was still causing much suffering. The injured heel and foot was exhibited to the jury, and was observed by them as different witnesses testified. They placed the damages at $7,500, and, considering all the facts and circumstances, we do not feel that we will be justified in reducing same.

In his fourth proposition appellant urges that, where an injury occurs under circumstances creating liability against a third party, and the injured person accepts compensation, the compensation carrier becomes subrogated to the cause of action against such third party and has the absolute right to sue for damages, and the injured person who has claimed and received compensation has no right to bring suit in his own name and behalf without alleging and proving that the insurance carrier had failed or refused to bring such suit, and a suit thus brought solely in the name and interest of such injured person without such allegations should be abated.

■■ This assignment is directed at the court's overruling appellant's plea in abatement, and is based on article 8307, Sec. 6a, R. S. We think the assignment should be overruled. The Texas Workmen's Compensation Law, the provision of which is invoked by appellant, evidently contemplates that the injured employee is the real beneficiary in cases where the damages suffered exceed, as they most always do, the amount received by the employee from the indemnifying association. It has been frequently held that in equity the real beneficiary may always be permitted to sue for the protection and enforcement of his right where the party having the mere legal title or right fails or refuses to do so. Galveston-Houston Electric Ry. Co. v. Reinle (Tex. Civ. App.) 264 S. W. 783, 789 (writ refused); Galveston, H. & S. A. Railway Co. v. Mallott (Tex. Civ. App.) 6 S.W.(2d) 432, 435; Lancaster v. Hunter (Tex. Civ. App.) 217 S. W. 765; Haynes v. Bernhard (Tex. Civ. App.) 268 S. W. 509. The statute invoked does not destroy or abrogate appellee's cause of action, and it is well settled that when the indemnifying association fails to sue, as it did here, the injured employee, or his beneficiary, may do so, although compensation under the law may have been claimed and received. Galveston, H. & S. A. Railway Co. v. Wells (Tex. Civ. App.) 15 S.W.(2d) 46, 53. But appellant says the right of the indemnifying association is absolute. Under the statute it has an absolute right to institute suit, but such right is not exclusive. The cause of action is jointly owned by the injured employee or his beneficiaries, and the insurance carrier. The right of the insurer to be subrogated to the rights of the injured employee is for the insurer's benefit to the extent only of the sums paid by

it to the injured employee or his beneficiaries, while the excess of any recovery had in such suit against the negligent third party is for the benefit of the injured employee and his beneficiaries. The statute expressly provides that, where the association brings the suit, it "shall not have the right to adjust or compromise such liability against such third person without notice to the injured employee or his beneficiaries and the approval of the board, upon a hearing thereof." This recognizes in and preserves to the injured employee or his beneficiaries a continuing right to assert a claim for damages against the negligent third person causing the injury, over and above the compensation claimed and received from the insurance association. If, in the instant case, appellee acted too precipitately, the association, nevertheless, intervened and merely claimed the right to subrogation; it asserted no right to control the litigation, and judgment was given it for the amount to which it was entitled out of the judgment for appellee Morris. Hanson v. Ponder (Tex. Com. App.) 300 S. W. 35; Galveston, H. & S. A. Railway Co. v. Wells (Tex. Civ. App.) 15 S.W.(2d) 46, 53.

Appellant's fifth proposition complains that the court's action in permitting the compensation insurance carrier, the Ocean Accident & Guaranty Corporation, Limited, to intervene after the trial had begun, and to file its petition of intervention while the evidence was being closed, was reversible error, for in that it deprived the defendants of all opportunity to plead to the case of the intervener, or to prepare its defense on the facts against the intervener without delay in the trial.

■ The facts reflected by the record are that, when the cause was called for trial, appellant presented its plea in abatement, which was heard and overruled by the court. Then was heard appellants general demurrer and special exceptions to appellee's petition, and they too were overruled. All parties then announced ready for trial. At this juncture the Ocean Accident & Guaranty Corporation, Limited, appeared by counsel and requested permission to intervene. It had not in any way been named or made a party to the suit by the plaintiff, appellee, but in appellant's plea in abatement he had alleged and urged that the cause of action asserted by appellee was a joint cause of action owned by appellee Morris and said insurance carrier, and that the suit could not proceed by plaintiff (appellee) alone unless and until said insurance carrier was made a party to the suit, so that any right it might have could be adjudicated. In its plea in abatement, and also in its answer, appellant fully pleaded all the facts as to appellee's injury, his claiming compensation insurance from the insurance carrier, the paying of said compensation by the inter-

vener herein, and its acceptance by appellee, and that under the facts and the law intervener was subrogated to the rights of appellee to the extent it had advanced compensation to appellee. We think these allegations in said pleadings supplied the want of any such allegations by appellee, if necessary to the institution and maintenance of his suit. In any event, the insurance carrier had the right to intervene. The insistence is that its intervention was untimely, and that the court abused its discretion in allowing it to intervene at the time it did. This contention is overruled. Undoubtedly it was within the discretion of the court to permit the insurance carrier to intervene and assert its rights, the limitation on this discretion being that the intervention should not delay the trial of the cause, and should not work any injury to defendant in the preparation and presentation of his defense. There was no delay—the trial immediately proceeded. No delay was requested by defendant for time to answer the intervener or for any purpose. There is no pretense that appellant was surprised by the intervention. That he was perfectly acquainted with every fact relative to the intervener's claim and right is shown by the full statement of the facts constituting same in his plea in abatement and answer. This is also shown by defendant's contention in his plea in abatement that the suit should not proceed unless and until the insurer was made a party to the suit that its rights might be adjudicated. Moreover, appellee filed answer to the plea in intervention. So, no injury is shown by permitting the intervention in the manner and at the time it was granted. Furthermore, it has been held that a party may intervene in a suit, with leave of the court, at any time before the issues are fully determined between the plaintiff and defendant, where no delay results in the trial of the principal suit. Smalley v. Taylor, 33 Tex. 668; Zucht v. Jorrie (Tex. Civ. App.) 294 S. W. 687.

The sixth proposition asserts that the petition of the intervener was insufficient to state a cause of action under its right of subrogation under the compensation law. This assignment is overruled. We think, under the undisputed facts relative to the injury of appellee, his claim for compensation, the admission of liability by the insurer, the payment of compensation to appellee, that the petition of intervention was not only sufficient, but that the matter insisted on by appellant is one of which he cannot complain. Moreover, appellant, in his plea in abatement and in his answer to appellee's petition, pleads and admits the things which he now complains were not pleaded. In any event, we hold the pleadings sufficient.

Appellant's seventh proposition urges that counsel for intervener was guilty of improper and hurtful argument to the jury, in that said counsel told the jury "that the insurance company had paid out in compensation and medical expenses $2000.00 and that the insurance company would be reimbursed for that amount out of any judgment rendered." Appellant says that he objected and excepted to said argument, which objection was sustained by the court and that then he (appellant) requested the court to instruct the jury not to consider said argument, which the court failed to do, to which action of the court in not so instructing the jury appellant excepted and preserved his said exception by bill. The court approved appellant's bill with this qualification: "The above bill of exceptions has been examined and is allowed and ordered filed as a part of the record in this case, with this qualification, that when the objection was made by defendant's counsel and sustained by the court, counsel for intervener withdrew his remarks, and acquiesced in the ruling of the court—the court does not recall that he failed to instruct the jury not to consider the remarks of intervenor's counsel, and the court now thinks that the objection should have been overruled, because intervenor's pleadings and prayer was to the effect as indicated in the remarks of intervenor's attorney." Appellant accepted the bill with this qualification. It shows that, when the objection was made to the argument, counsel for intervener, not only abided the ruling of the court, but also withdrew his remarks. We think, in the absence of a showing that the argument was hurtful, this was sufficient. It is contended by appellant that the argument was hurtful, in that it must have conduced to the finding of a larger verdict than would have otherwise been found by the jury, in order to make up to appellee for the amount he would lose out of his judgment in recouping intervener. The jury found that appellee had been damaged in the sum of $7,500. We have already held that under the facts this was not an excessive amount. Under the pleadings and the proof the jury must have known that intervener would have judgment out of the amount recovered by appellee for the sum it had paid to appellee. We do not think any injury to appellant is shown. If the argument was improper, under the circumstances, it was harmless. The assignment is overruled.

The judgment should be affirmed, and it is so ordered. Affirmed.