Leo SADE et al., Plaintiffs,

v.

A. Kieffer STALEY, Defendant.

Civ. A. No. 2378–59.

United States District Court

District of Columbia.

Jan. 7, 1963.

Lloyd J. Derrickson and Frank J. Wilson, Washington, D. C., for plaintiffs.

Branko Stupar, Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is the trial of an action for breach of contract for the sale of certain capital stock of a corporation known as Cominol Oil Company. The defendant owned 1,000 shares of the stock and ordered the plaintiffs, who are stockbrokers, to sell the stock for his account. The order was given on the evening of December 1, 1958. On the following morning the order was executed by the plaintiffs and the stock was sold in the usual course to other brokers. One hundred shares were sold at $2.75 a share and 900 shares were sold at $2.50 a share. Thus, the aggregate price realized by the plaintiffs for the account of the defendant was $2,525.

The defendant, however, repudiated the sale and, having changed his mind, asked the brokers to cancel it. He was informed that it was too late. The defendant persisted in his refusal to deliver the stock to the brokers, and the latter

purchased stock in the open market in order to satisfy their commitment to other brokers to whom they had sold the stock for the defendant's account. This action for damages by the brokers against the customer followed.

■ The defense was interposed that the defendant was induced by alleged misrepresentations said to have been made by the plaintiffs' salesman to place the order for the sale of the stock. The alleged misrepresentation was claimed to have consisted of a statement made by the salesman to the defendant to the effect that directors and officers of the company were selling their own stock and the stock would become worthless. The defendant testified that this representation was made; the salesman denied that he had made it. If the issue was at all material there would be a question for the jury. However, there is no sufficient proof to the effect that the representation, if made, was false. There is no proof justifying the submission of that issue to the jury. Consequently, the defense of misrepresentation and fraud is out of the case.

There thus remains no justification for the defendant's breach of contract and the plaintiffs are entitled to recover damages for the defendant's breach. The principal question that emerges is what measure of damages should be applicable.

Although the stock should have been delivered, under the customs of the trade, by December 8, 1958, the stockbrokers did not buy the stock for the defendant's account until January and February. By that time the stock had gone up in price several fold and it cost the brokers $9,321.50 to buy the stock at that time on the open market in order to satisfy the commitment that they had made to other brokers for the defendant's account. The plaintiffs claim that the measure of damages should be the difference between this market price and the price at which they had sold the stock for the defendant's account.

■ What the measure of damages should be is, of course, a question of law. It is well established as a fundamental and elementary principle that a person who is injured by a breach of contract must take reasonable steps to mitigate his damages. He may not sit back and watch his damages grow and seek to collect them when in his judgment they have become sufficiently enhanced. He must use appropriate means to cut off the damages as much as possible. For example, in respect to sales of goods, this principle is recognized by the Uniform Sales Act, which is law in the District of Columbia. In D.C.Code, Title 28, Section 1505, subsection (3), which relates to the measure of damages in an action for failure to deliver goods, it is provided that where there is an available market for the goods in question, the measure of damages is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered. We are not dealing with goods here, but this provision of the Uniform Sales Act is mentioned by way of illustration as showing the general tendency of the law in measuring damages for breach of contract to deliver property.

■ The Court is of the opinion that in an action for failure to deliver stock on a particular day, the measure of damages is the difference between the contract price and the market price on the date when the contract was broken, that is, the last day on which the delivery of the stock should have been made. This rule of law was enunciated in England many years ago in the case of Shaw v. Holland, 15 Meeson & Welsby 136. That, too, was an action for failure to deliver securities pursuant to a contract. Fifty shares of a certain stock were involved. It appears from the report of the case that the jury assessed the damages at 675 pounds sterling. The date of the breach was March 10, 1845, because that was the date on which the stock should have been delivered. It was proved that on March 10, 1845, the price was such as to make a difference upon the 50 shares amounting to 450 pounds. The trial judge instructed the jury that he did not

consider the damages limited by the price within the time specified and that the question of damages was for the jury. On appeal, in an opinion by Baron Parke, the damages were reduced to 450 pounds; namely, the difference between the market and contract price on the date that the stock should have been delivered to the plaintiff. The Court stated that the plaintiff might have gone into the market and bought other shares as soon as the contract was broken. That case obviously is on all fours with the case at bar.

In the District of Columbia there is an old case decided in 1820, Tayloe v. Turner, Fed.Cas. No. 13,770, 2 Cranch C.C. 203. That opinion reads as follows:

> "Debt on bond conditioned to transfer stock of the Washington Bridge Company.

> "The Court, * * * at the prayer of the plaintiff's counsel, instructed the jury that the rule of damages was the price of the stock on the day on which it ought to have been transferred according to the contract."

Neither counsel nor the Court have been able to find any later case in the District of Columbia on this point, but the two cases to which I have referred, especially in the light of the basic general principles, establish the measure of damages to be applied in this case.

There is a dictum to the contrary in an Arizona case, Bank of Bisbee v. Graf, 12 Ariz. 156, 100 P. 452, in which the Court stated that counsel were agreed that the law was that upon the refusal or failure of the customer to deliver stock to the broker which the customer had ordered the broker to sell, it is the right and duty of the broker, within a reasonable time, to go into the market and purchase the stock, and the measure of damages is the increased price which the broker is compelled to pay. However, on analyzing the facts in that case, the breach took place on February 1, 1907, and the plaintiff bought other stock on the following day. Consequently, the facts do not support the broad dictum.

Plaintiffs' counsel have cited the case of Burhorn v. Lockwood, 71 App.Div. 301, 75 N.Y.S. 828, decided by an intermediate appellate court of the State of New York. That case is distinguishable not only on the facts but on principle as well. It involved a situation that is also presented in many other cases, of a broker who was holding stock for his customer and without authority sold that stock. In other words, he was guilty of a conversion. The rule, indeed, is that under those circumstances the customer may recover as damages the difference between the price at which the stock was wrongfully sold and the highest market price at which like stock was sold in the open market within a reasonable time thereafter. The principle on which this line of authorities is based is not applicable to a breach of contract to deliver stock; they involve a situation where an agent wrongfully converts his principal's stock.

It appears that in this case, as has been stated, the stock should have been delivered before the close of business on December 8, 1958. Consequently, it would have been reasonable and proper for the brokers to wait until the following day before buying in the stock for the account of the customer. The evidence shows that the price of the stock on December 9, that is, the price at which it was offered for sale, was $3 a share. Consequently, the market price of 1,000 shares on December 9, would have been $3,000.

■ The plaintiffs are entitled to recover the difference between the sum of $3,000 and the sum of $2,525, for which they sold the stock for the defendant's account. Accordingly, the Court will direct a verdict for the plaintiffs for the sum of $475.

■ There is also a side transaction. The plaintiffs purchased for the defendant's account, pursuant to his order, 50 shares of stock of the Union Trust Company. When the defendant committed the breach of his contract in respect to the Cominol Company stock, the plaintiffs

sold the Union Trust Company stock for the account of the defendant and credited him with the proceeds. In the light of the ruling that the Court is making in respect to the plaintiffs' claim, the conclusion follows that the sale of the Union Trust Company stock was wrongful and unjustified. Accordingly, the Court will render a decree of specific performance directing delivery by the plaintiffs to the defendant of 50 shares of the capital stock of the Union Trust Company. That, of course, is not a jury issue, but this ruling will be included in the decree.

The Court will direct a verdict at this time in favor of the plaintiffs against the defendant for the sum of $475.