SOUTHWEST TITLE INSURANCE COMPANY, Appellant,

v.

NORTHLAND BUILDING CORPORATION et al., Appellees.

No. 17736.

Court of Civil Appeals of Texas, Fort Worth.

Sept. 17, 1976.

Rehearing Denied Oct. 22, 1976.

438

**440**

Elmer Parish, Gene Richie, Wichita Falls, for appellant.

Nelson, Montgomery & Robertson, and David Tate, Wichita Falls, for appellee, Northland Bldg. Corp.

Keck & Barnes, and Douglas A. Barnes, Dallas, for appellee, Jeffrey Grynwald.

Byron H. Schaff, Plano, for appellee, First National Bank of Plano, Texas.

Fillmore, Lambert, Farabee & Purtle, Wichita Falls, attorneys for appellee, Guarantee Abstract & Title Co.

## OPINION

SPURLOCK, Justice.

Northland Building Corporation (Northland) brought this suit against Southwest Title Insurance Company (SW Title), which had issued a mortgagee's title policy to Northland; against Jeffrey Grynwald (Grynwald), who closed the loan and disbursed the funds; and against First National Bank of Plano, Texas (Bank), the depository of the loan check.

SW Title filed cross-claims against the Bank and Grynwald, and a third party complaint against Guarantee Abstract & Title Company in Wichita Falls (Guarantee Title).

The Bank filed a counterclaim against Northland and cross-claims against Grynwald, and SW Title.

The parties will be referred to by their abbreviated names appearing in brackets above.

After a jury trial judgment was rendered that Northland recover of and from SW Title the sum of $45,801.14 with interest thereon at the rate of 18% per annum from August 1, 1972, until the date of judgment with interest on $45,801.14 from the date of judgment until paid at the rate of 10% per annum. All other relief sought was denied. SW Title has appealed. It assigns 59 points of error (numbered 1–45 and 47–60).

We affirm.

## SUMMARY OF PLEADINGS

The pleadings are voluminous. In very brief form the pertinent parts follow: Northland contends that by contract, in the form of a commitment letter accepted by the borrower, plaintiff contracted to lend $55,000.00 to Dal-Rich Investments, Inc. (Dal-Rich) provided all the conditions set forth in the detailed commitment letter were met. The letter detailed second and third deed of trust liens on Lots 6, 7, 8, 9, 10, Block 2; Lots 7, 8, 9, 10, Block 5; and Lot 1, Block 3, in the North Richardson Addition, City of Richardson, Dallas County, Texas, that were to be furnished by Dal-Rich. The pertinent parts of the commitment letter involved in this suit are stated below:

1. Northland was to be furnished a deed of trust lien on Lots 6, 7, 8, 9 and 10, of Block Two of North Richardson Addition to the City of Richardson, Texas. This was to be a second lien inferior only to a described lien then in existence that secured a debt in the amount of $171,000.00 but which unpaid balance was not to exceed $172,000.00. The commitment letter also describes other property and other liens to be procured.

2. Northland was to be furnished with written statements (hereinafter called "estoppel certificates") from the superior lien holders on such tracts, which statements would specify, among other things, the present balance of the indebtedness secured thereby and "that they recognize that (and regardless of any provisions in their notes or deeds of trust to the contrary) their deed of trust liens are superior to the lien granted Northland only to the extent of the present balances plus interest hereafter accruing thereon, reasonable attorney's fees, trustee's fees, and any payments made by them for taxes, insurance or to otherwise protect the property and their lien." [1]

3. Evidence of title was to be furnished by written title search report for North-land's attorneys to examine or, alternatively, in lieu of the written title reports Northland was to be furnished with "mortgagee title insurance policies (in a form to be reasonably approved by Northland) insuring a valid second or third (whichever the case may be as above set out) deed of trust lien in Northland for each of the properties securing the payment of the above-described note."

Northland further pled this commitment letter was accepted by Dal-Rich. In connection with the events leading up to the closing, Grynwald represented to Northland that he was an agent and representative of SW Title and authorized to close the loan transaction on its behalf and to issue mortgagee title insurance policies in connection therewith. Then followed pleadings detailing its contention that Grynwald was an agent of SW Title in all things in connection with the closing of this loan, and was authorized by SW Title, through its agent, Guarantee Title, to accept the obligation to close according to the instructions in the commitment letter. It also alleged that if Grynwald was not the agent or representative of SW Title, then SW Title allowed Grynwald to collect the premium for the policy in question, allowed him to deliver the final policy to Northland, and SW Title retained its portion of the premium for the issuance of the policy, and therefore the agency relationship and authority was ratified by SW Title, and Grynwald had apparent or implied authority to act for SW Title in connection with the entire transaction. Northland then alleged the details of the closing of the loan and all transactions that led up to same; that the loan check was delivered to Guarantee Title, an agent of SW Title. The check, made payable to SW Title, was forwarded by said agent to Grynwald, its other agent. It was endorsed and cashed by Grynwald on behalf of SW Title, the funds were disbursed, and SW Title through Grynwald furnished Northland a

---

1. Some deeds of trust contain so-called "dragnet" clauses which provide, substantially, that the lien secures not only the payment of the debt then owing, but also any debt which may thereafter become owing. The above clause was obviously placed in the commitment certificate in order to protect Northland from any "dragnet" clause that might be in the deeds of trust of the holders of superior liens.

mortgagee's title policy. The policy showed on its face that the lien, held by the Bank on Lots 7, 8, 9 and 10 of Block Two of the above-named addition, was in the amount of $170,901.34 and that its lien would be superior to Northland's lien only to the extent of such present balance plus interest thereafter accruing, reasonable attorney fees, trustees fees, and any payments made by such Bank for taxes, insurance, or to otherwise protect the property and lien thereon. There were similar allegations concerning a lien on Lot 6, Block Two, in the same addition.

Dal-Rich defaulted. Bank then foreclosed under its deeds of trust and claimed that its balance owing was $254,073.08. The estoppel certificates, purportedly signed by the president of the Bank, were forgeries, as was stipulated during the trial.

The Bank was liable because it had converted the loan check, on the theory of money had and received, and breach of warranty under Sections 3.417 and 4.207 of Tex.Bus. & Comm.Code Ann.

Each of the defendants and the third party defendant pled a general denial.

SW Title specifically denied each of the material allegations contained in Northland's petition. In its actions against Grynwald, Bank, and Guarantee Title, stated in very brief form, SW Title contended that Grynwald was only an approved attorney and not its agent, and that Grynwald and Guarantee Title exceeded their authority or had no authority, and that since the check was made payable to SW Title, said check was notice to the Bank that Grynwald had no authority to cash the check or deposit same. It then sought indemnity against these defendants.

The Bank pled the two-year statute of limitation; a plea in confession and avoidance in that Northland intended Grynwald to close the subject matter and to receive the check; that SW Title was barred because of the provisions of Tex.Bus. & Comm.Code Ann. § 3.405, (which provides that an endorsement by any person in the name of a named payee is effective if the person signing on behalf of the maker or drawer intends the payee to have no interest in the instrument, or an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest); that it owes no duty to SW Title because SW Title has no interest in the subject check; accord and satisfaction because the entire fund was disbursed in the proper amounts and to the proper entities, and Northland received its mortgagee's title policy; that the issuance of the title policy and its acceptance by Northland constituted an accord and satisfaction of all claims of every description against the Bank; that no allegations were made that anyone suffered damages proximately caused by the Bank's having allowed Grynwald to endorse and deposit the check; and that the transaction was ratified by Northland and SW Title. Then follow specific denials of all of Northland's allegations. The Bank also alleged laches and waiver, contributory negligence on the parts of SW Title and Northland, inducement, ratification, waiver, estoppel, and other defenses.

## UNDISPUTED FACTS

During the trial the following facts were established without dispute:

1. SW Title had made Guarantee Title its agent in and for (sic) Wichita County, Texas, by contract in writing signed by SW Title by Spencer Littleton, Vice President. The contract refers to SW Title as "Company" and Guarantee Title as "Agent". Pertinent parts of the contract are:

a. Guarantee Title had authority to issue SW Title's policies, commitments and binders for a fee of 20% of the gross premiums charged for all policies it issued.

b. SW Title agreed to furnish to Guarantee Title policy forms, supplies, application forms, rate schedules, and attorney's certificates. Guarantee Title agreed to be accountable for these policy forms.

c. All commitments to insure, policies, or binders were to be based on the opinions or title reports of attorneys "approved" by SW Title.

d. "Agent agrees that all commitments to insure, policies, or binders of any kind issued by Agent for and on behalf of Company shall be based upon the opinions or title reports of attorneys approved by Company."

e. Agent agrees to "furnish the name or names of its duly authorized officers or attorneys who shall be authorized and designated to countersign and validate policies or other commitments."

2. Grynwald was an approved attorney for SW Title.

3. Northland furnished Grynwald forms for estoppel certificates, deeds of trust, and other instruments to be used in the closing. Lyons, attorney for Dal-Rich, had prepared the liens and closing documents and sent them to Grynwald who rejected them because they did not conform to Northland's instructions. Grynwald then prepared the closing instruments in the form required by Northland and charged Dal-Rich for this service.

4. SW Title, through Littleton, its Vice President and agency representative, and George M. Ramsey, its field representative, had authorized Grynwald to close real estate transactions on behalf of SW Title.

5. Grynwald, with the prior approval of Ramsey and Littleton, had been closing real estate transactions and issuing title policies for SW Title since 1970. He had handled approximately 30 such transactions during that period of time.

6. Grynwald's usual procedure in closing a transaction was to call Southwest Land and Title Company, the Dallas agent of SW Title, and have it furnish the title data. Based upon this information, Grynwald would close and type a SW Title insurance policy on blank forms furnished him by SW Title. He would then send the policy to SW Title along with a transmittal letter to the insured prepared by Grynwald, and the policies would be countersigned and sent with the letter to the insured.

7. In compliance with a requirement of Northland, Grynwald had furnished Northland's attorney a blank copy of the SW Title's mortgagee's policy to be issued, which was approved by Northland.

8. After the forms for most of the closing instruments had been approved by Northland, it, through its attorney, Tate, delivered a letter to Guarantee Title, at its Wichita office. The letter was addressed to "Southwest Title Insurance Company, c/o Guaranty Abstract & Title Company, 816 7th Street, Wichita Falls, Texas." Enclosed was a check in the sum of $55,000.00 made payable to SW Title.

9. The letter gave explicit instructions to SW Title concerning the closing. It stated, "such funds should be disbursed for such loan whenever you have satisfied yourself that *all requirements* of Northland's commitment letter dated October 5, 1971, and accepted by Dal-Rich Investments, Inc. on October 7, 1971, have been met . . . ." (Emphasis ours.)

10. Guarantee Title caused the letter and check to be placed in the possession of Grynwald, an approved attorney of SW Title, who proceeded to endorse SW Title's name to the check, deposit it in his escrow or trust account with the Bank, close the loan and disburse the funds in the correct amounts to the proper entities.

11. Grynwald had obtained the title information that was used in approving title from Southwest Land and Title Company, of Dallas County, an agent of SW Title. The title data furnished Grynwald shows his name as the closer.

12. Grynwald's office typed the mortgagee's policy here involved from the blank forms furnished by SW Title, wrote a letter to Northland's attorney and mailed both to SW Title's office in Dallas where the policy was countersigned. The policy and letter of transmittal prepared by Grynwald were mailed to Northland's attorney. The estoppel certificates purportedly signed by the Bank were mailed to Northland's attorney by Grynwald.

13. Grynwald also issued a check to SW Title for 20% of the premium charged and a check for 40% of the premium to SW Land and Title Company. He also paid himself

40% of the premium. Each check was drawn on Grynwald's escrow or trust account with the Bank.

14. Grynwald closed the transaction in exact accordance with the instructions received from SW Title's agent in Wichita, except that the estoppel certificates were forged; and therefore SW Title did not furnish valid estoppel letters as instructed by the lender.

15. Grynwald was not licensed or bonded by the State of Texas as an agent of any title company.

16. Dal-Rich defaulted after making 7 monthly payments on the note. Northland contacted the Bank and for the first time learned the estoppel certificates were forged and the Bank's liens were for amounts greatly in excess of the limits of the amounts of the debts secured by liens specified in the estoppel certificates and commitment contract. The Bank had the property posted for sale under its deeds of trust.

17. Northland immediately notified SW Title in writing of the above situation. SW Title replied that Grynwald was not its agent, and did nothing further.

18. SW Title had full knowledge of all the facts through a letter from Northland, the taking of depositions, and the trial of this case, but retained the proceeds of the transaction and never tendered the premium to Northland.

19. Its other agent who received a portion of the premiums, SW Land and Title, did not tender to Northland any of the proceeds of the transaction.

20. The Bank foreclosed on the property on which it had liens and bought the property in at foreclosure sale.

21. Prior to foreclosure, Northland offered to pay the Bank the amount of the liens as stated in the forged estoppel certificates. The Bank refused the tender.

22. The amount of the Bank's lien at the time of foreclosure was $253,416.70.

23. Neither SW Title nor Northland bid on the property at the foreclosure sale.

24. Each of the makers of the notes here involved is insolvent.

25. Guarantee Title had authority to appoint agents for SW Title.

26. The effective date of Northland's liens was October 15, 1971.

27. The date of the foreclosure sales by the Bank was August 1, 1972.

28. The value of the property here involved was the same on both dates of October 15, 1971, and August 1, 1972.

29. The Bank was advancing money to Dal-Rich to purchase automobiles bought in connection with its operation of an auto dealership. It continued to so advance money for this purpose after the Northland/Dal-Rich transaction was closed. This floor plan financing increased the amount of the debts secured by the Bank's liens after the above Northland/Dal-Rich transaction was closed.

### SUMMARY OF JURY FINDINGS

Stated in very brief summary form the jury found: (1) in closing the transaction Grynwald acted as an agent of SW Title; (2) Grynwald acted as an apparent agent of SW Title; (3) Lots 7, 8, 9 and 10 had a cash value of $265,000.00 on August 1, 1972; (4) on said date Lot 6, Block 2, had a cash market value of $27,000.00; (5) on said date before foreclosure the debt secured by the first lien to the Bank was in the sum of $253,416.70; (6) Grynwald did not induce Northland to issue the $55,000.00 check in the name of SW Title; (7) SW Title suffered no damage as a result of the act of the Bank in accepting the check for deposit; (8) Northland suffered no damage by reason of the Bank's acceptance of the check for deposit; (9) on August 1, 1972, Northland did not know that SW Title had denied the authority of Grynwald to endorse the check; (10) SW Title accepted the benefits of the transaction; (11) SW Title ratified the endorsement of the check by Grynwald; (12, 13) Northland requested Dal-Rich to secure both estoppel letters; (14) Grynwald did not act as an agent for Dal-Rich in closing the transaction; (15) Grynwald was

authorized by SW Title to endorse the check; (16) Bank acted prudently in depositing the check to the trust account of Grynwald; (17) SW Title authorized Guarantee Title to mail the check to Grynwald; (18) Grynwald was authorized by SW Title to receive and disburse these funds; (19) Grynwald was not acting as an agent for Dal-Rich in preparing and accepting the estoppel letters; (20) Northland was not negligent in instructing Guarantee Title to forward the check to Grynwald; (21) such negligence, if any, was not a contributing cause of the damages suffered by Northland; (22) Grynwald followed the directions in the commitment letter (this finding was disregarded by the Court); (23) Northland relied upon the estoppel letters; (24) Bank was authorized by SW Title to deposit the check to Grynwald's account; (25) on October 18, 1971, Grynwald did not know the estoppel letters were forged; (26) Grynwald did not guarantee the authenticity of the signatures on the estoppel letters (this finding was disregarded by the Court); (27) Northland suffered damages; (28) these damages were caused by the forged estoppel letters.

## NO EVIDENCE, INSUFFICIENT EVIDENCE AND AGAINST THE GREAT WEIGHT AND PREPONDERANCE OF THE EVIDENCE POINTS OF ERROR

SW Title assigns a "no evidence" point, an "insufficient evidence" point and an "against-the-great-weight" point of error concerning the *submission* of most of the issues submitted to the jury that were found adversely to it. No Motion for Judgment non obstante veredicto or Motion to disregard any of the jury's findings was filed by SW Title.

■ SW Title assigns error in the action of the Court in overruling its Motion for Directed Verdict based on "no evidence," "insufficient evidence," and "against-the-great-weight" in that Grynwald could not be an agent or escrow agent as a matter of law. We hold that Northland's pleadings are supported by evidence of a probative nature adduced during the trial.

With the exception of the findings of the jury in response to Issues 22 and 26, which were disregarded by the Court, we hold that not only were these issues upon which the judgment was based properly submitted, or established as a matter of law; but also the jury's findings thereto were supported by evidence of a probative nature and no finding of the jury was against the great weight and preponderance of the evidence.

We overrule points of error Nos. 32, 33, 34, 35, 36, 37, 40, 41, 42, 43, 45, 47, 48, 51, 52, 53 and 54.

## EXCLUSION OF TESTIMONY—POINTS NOS. 1–14

Each of these points assert error of the Court in excluding portions of the testimony of John Crutchfield, former Vice President and General Counsel of SW Title.

The tendered testimony in summary form, for the most part, is listed below using the numbers of the points of error asserted.

■ 1. Grynwald was not an escrow agent of SW Title.

Elsewhere this witness testified before the jury, without objection, that Grynwald was never an escrow agent of SW Title.

It is a well settled rule of law that the exclusion of evidence by the Court, if otherwise error, is harmless where other evidence of substantially the same nature and effect has been admitted. *Fulton Fire Ins. Co. v. First State Bank of Willis*, 353 S.W.2d 937 (Tex.Civ.App., Waco, 1962, ref., n. r. e.).

3. In insurance law an agent is a person who owns a licensed abstract plant who is licensed before the State of Texas Insurance Board and who posts the necessary insurance bonds.

4. The law requires that before anyone connected with SW Title can receive and disburse money, said person would have to be licensed and bonded by the Insurance Board.

█ The court's exclusion of this testimony was correct because the answer to these questions would require the witness to interpret the law, invade the province of the jury, and are mixed questions of law and fact.

█ Even if the court did err in excluding the testimony referred to in Nos. 3 and 4 above, such ruling was harmless as evidenced by the following proceedings in the presence of the jury.

"Q And if you will, please, tell us what is meant in the title insurance field when you refer to agents of a title insurance company?

"A A person owning a licensed abstract plant who is licensed before the State Board of Insurance, who posts the necessary bonds.

"Q Now, I will ask you whether or not Article 9.35 of the Insurance Code pertaining to agents for title insurance companies so defines?

"A Yes, sir, it does."

An objection was made that the statute speaks for itself and the witness should not be permitted to construe same because that is the Judge's function. The court sustained the objection after the witness answered the question.

No motion was made to strike this testimony or to instruct the jury not to consider the answer.

The witness then further testified:

"THE COURT: Yes. The witness can quote the statute verbatim, Mr. Parish.

"Q All right. If you will, please, read for us what 9.35 describes an agent to be. Read down to the semi-colon here.

"A All right. 'No person, firm, association or corporation shall act within this state as agent for any title insurance company, domestic or foreign, without first having been (1) licensed as an agent by the Board and (2) filing a bond or cash deposit in lieu thereof as required in Article 9.38.'

"Q Now, what bond is required in Article 9.38?

"A Seventy-five hundred dollars.

" . . .

"Q Officers, all right, sir. And what are the duties of an escrow officer?

"A After an escrow officer is licensed he is authorized to receive and disburse funds."

In addition thereto during the cross-examination of the attorney for Northland, he quoted the same sections of the Insurance Code and admitted "that is the way the law reads."

If the action of the court in sustaining the objection to the above tendered testimony was error, it was harmless.

Points 2, 5, 6, 7, 8, 9, 10, 11, 12 and 14 assert error in that Crutchfield was not permitted to testify as to the authority given by SW Title to Grynwald (not based on his personal knowledge) (2) to endorse the check, (5, 6) SW Title did not give anyone authority to receive and disburse the check without being an escrow officer, (7) Grynwald was not authorized by SW Title to receive and disburse funds, (8) Grynwald was not authorized by SW Title to receive funds from Northland, (9) SW Title did not authorize Grynwald to endorse the check, (10) the first knowledge that SW Title had that a check had been issued by Northland was on January 15, 1974, (11) the first knowledge that SW Title had that the Bank had deposited the check to Grynwald's account was on January 15, 1974, (12) SW Title did not authorize Guarantee Title to mail a check to Grynwald, (14) the Bank did not notify SW Title they had deposited the check to Grynwald's account.

It is undisputed that Littleton is the Vice President of SW Title and its agency representative. He is the one who signed on behalf of SW Title the agency contract with Guarantee Title. Ramsey is the field representative of SW Title and is the person connected with said company to whom Grynwald mailed the premiums collected for the issuance of the title policy here in question.

It is undisputed that Grynwald made his arrangements with SW Title to be their

representative through Littleton and Ramsey.

Prior to the occasion here involved, Grynwald had handled some 30 closings and the preparation of title policies for SW Title upon the authority given him by Littleton and Ramsey.

Crutchfield testified that after the transaction here involved he conferred with Littleton and Ramsey. He was then prepared to testify as to the conversation he had had with them. This was excluded. Thereafter, Crutchfield was asked a series of questions concerning whether or not SW Title had authorized Guarantee Title and Grynwald to do the acts that they did in connection with the transaction here involved. By indirection Crutchfield attempted to get before the jury the results of his conversation with these two persons.

The Court repeatedly instructed the witness that he could testify about anything about which he had personal knowledge. The witness, being a lawyer, understood that he could not testify about matters that were hearsay.

In Volume 1, Texas Law of Evidence, McCormick and Ray, Sec. 793, The Hearsay Rule—First-Hand Knowledge by the Witness as a Necessary Qualification, the general rule is stated that subject to some exceptions reports made to the witness by others and his inferences therefrom are hearsay as are mere guess, fancy or conjecture. In general, statements of the witness which is based upon information received from communications of others to the witness is hearsay.

Some of the questions called for an interpretation of the law, were conclusions, or are mixed questions of law and fact.

The rule as stated in Texas Law of Evidence, supra, Section 1423, Opinion Evidence—General Principles: "The Opinion rule forbids the reception of opinions on questions of law or mixed questions of law and fact." In Section 1426 thereof, the rule is stated: " . . . The same rule applies to the question of whether a person had authority as an agent and the extent of such authority."

In *Hardin v. Rust*, 294 S.W. 625 (Tex.Civ. App., Amarillo, 1927, err. ref.) plaintiff brought an action for injuries caused by the collapse of a portion of a bridge over which he drove his truck. The bridge was undergoing repairs at the time. The foreman of Austin Bridge Company had advised plaintiff that it would be safe to continue with the truck and engine. The plaintiff relied upon this statement, resulting in his injuries. The tendered testimony of the president of the company to the effect that the foreman had no authority to pass on the capacity of the bridge was held inadmissible as a conclusion.

In *Weimer v. Prince & Prince*, 246 S.W. 666 (Tex.Civ.App., Fort Worth, 1922, dism.) this Court held the testimony of the owner of an oil lease and his general manager, that the latter had no authority from the owner to enter into a contract for the drilling of an oilwell, was a mere conclusion and therefore inadmissible.

In *Gulf, C. & S. F. Ry. Co. v. Kempner*, 275 S.W. 459 (Tex.Civ.App., Galveston, 1925, reversed on other grounds, Tex.Com. App., 282 S.W. 795), it was held that the testimony of the witness that he was acting as agent for Kempner was properly excluded because it was a conclusion.

It was admitted that Grynwald was neither licensed as an agent nor an escrow agent. The witness testified: " . . . tell us whether or not anyone was authorized to receive and disburse funds on behalf of Southwest Title Insurance Company, without having been appointed an escrow officer? A They were not." This answer was given in the presence of the jury. No motion to strike or to disregard was made.

Where an objection is made and sustained but no motion is made to strike the answer or instruct the jury not to consider, such testimony is before the jury for whatever it is worth. 56 Tex.Jur.2d, p. 518, Sec. 174 (1964 ed.), Trial—Motions to Strike or Exclude Evidence—Necessity.

This witness further testified before the jury, without objection, referring to Grynwald, "Well, he didn't have any authority to endorse checks in the first place." He also testified that Grynwald's conduct in accepting forged estoppel certificates were not binding on the company. He further testified, without objection, that Guarantee Title had no authority to forward the check to Grynwald for closing; that Grynwald had no authority to endorse the check; deposit it to his trust account; disburse the funds; or close the transaction.

■ The court did not err in excluding the tendered testimony. It is cumulative and in any event the error, if any, was harmless.

13. If the $55,000.00 check had been mailed to SW Title and if it had come across the witness' desk he would not have disbursed the funds without first checking with the first lien holders.

■ This testimony was properly excluded because it was speculative, conjectural and a hypothetical statement not based upon evidence in the record. Similar testimony was held to be properly excluded in *Gulf Insurance Company v. Ball*, 324 S.W.2d 605 (Tex.Civ.App., Amarillo, 1959, err. ref., n. r. e.).

■ Each of these points, 1–14, must be overruled for the additional reasons that the acts of Grynwald and Guarantee Title, comprising the transaction here in question, were ratified by SW Title. The jury further found that Grynwald was an apparent agent of SW Title. These jury findings made the excluded testimony of Crutchfield immaterial. The jury, in effect, found that even if Grynwald and Guarantee Title had no express authority, Grynwald did have apparent authority and his acts were ratified by SW Title.

Action of the court in excluding the testimony, if error, is harmless. Points 1–14 are overruled.

By its 17th point SW Title contends the trial court should have granted an instructed verdict because as a matter of law Grynwald could have been neither an agent nor escrow agent of SW Title without first having complied with the terms of the insurance code requiring that he be both licensed and bonded.

Also, by points 15 and 16, SW Title contends the court erred in connection with the submission of Issues Nos. 1 and 2 because the court did not instruct the jury in the language of "Articles 9.41, 9.42 and 9.43" of the Insurance Code to the effect that no person shall act as an agent for a title insurance company without having first been so licensed and having filed a bond, and is not permitted to disburse escrow funds without being so licensed and bonded.

Special Issue No. 1 made inquiry as to whether or not Grynwald, in attempting to follow the directions in the letter dated October 15, 1971 (and being Plaintiff's Exhibit No. 46), was acting as an agent of SW Title. The jury was instructed that an agent is one who acts in behalf of another under the latter's authority and for the latter's benefit.

Special Issue No. 2 was the same as above except it required the jury to find whether he was acting on that occasion as an apparent agent of SW Title.

In *Foundation Reserve Insurance Co. v. Wesson*, 447 S.W.2d 436 (Tex.Civ.App., Dallas, 1969, writ ref.) that court had before it a fact situation involving a non-licensed insurance agent who had collected premiums for the company and had not remitted them to the company. Some liability policies were cancelled for non-payment of premiums and the insurer took the position it was not liable for return of the premiums because it was prohibited from doing business through an agent who was not licensed in this State, and further the insurer was not licensed to do business in this State; and therefore it also could not do business in this State. That court held: "Appellant will not be permitted to avoid its responsibility for the return of unearned premiums collected by its own agent on the ground that the law prohibited it from having such an agent." That court also held that this agent had express authority as well as im-

plied authority to so act for the company under the facts in that case.

In *Sharpstown State Bank v. Great American Ins. Co.*, 441 S.W.2d 548 (Tex.Civ. App., Austin, 1969, reversed on other grounds, 460 S.W.2d 117 (Tex.Sup., 1970), on remand *Federal Deposit Ins. Corp. v. Great American Ins. Co.*, 469 S.W.2d 254 (Tex.Civ.App., Austin, 1971, ref., n. r. e.)) that court in construing a similar statute stated: " . . . the only penalties for violation of those statutory requirements are inflicted upon the insurance company, and upon the agent—not upon the insured or upon the public, for whose protection the statutes were designed.

"By similar reasoning, other Texas cases have established that the failure of the insurance company to obtain the license required of it, or its failure to obtain a permit to do business as required by statute, cannot be made the vehicle for exonerating it from liability upon policies issued by it to members of the public. (Citing authorities.)"

In *Millers' Indemnity Underwriters v. Patten*, 238 S.W. 240 (Tex.Civ.App., Amarillo, 1922, affirmed 250 S.W. 154, Tex.Com. App., 1923, opinion adopted) that court held: "If the appellant was doing business without procuring the necessary license, it cannot take advantage of its own violation of the law."

■ The holding proposed by SW Title would lead to the absurd and unjust result that any title company could avoid all the legal consequences of the acts of its agents simply by non-compliance with the licensing and bonding statutes. Such is not the law.

We hold the court did not err in overruling the motion for instructed verdict on this ground and it was not error to refuse the requested instructions.

Points 15–17 are overruled.

Points of error Nos. 18, 19 and 20 urge that the trial court erred in disregarding two of the jury's answers to special issues for lack of motion, notice and hearing.

■ These points are without merit. It is well-settled that a motion to disregard and notice thereof (but not a hearing thereon, *City of Port Lavaca v. Fisher*, 355 S.W.2d 785, Tex.Civ.App., San Antonio, 1962, no writ hist.) are required under Rule 301, T.R.C.P., before the judge may disregard jury findings.

The court in *Hines v. Parks*, 128 Tex. 289, 96 S.W.2d 970, 972 (Tex.Com.App., 1936, opinion adopted) said, "It is obvious, however, that even now in a case where there is a finding of a jury to a special issue which is raised by the pleadings, the only authority which the court has to disregard such finding is that given by the statute; and, of course, as the right is conferred by the statute, it can be exercised only in the manner and under the circumstances prescribed by the statute." See also *Missouri Pacific Railroad Co. v. Ramirez*, 326 S.W.2d 50 (Tex.Civ.App., Waco, 1959, ref., n. r. e.).

■ The judgment in this case recites such motion was made and notice was given thereof. There is nothing in the record to indicate this recitation is untrue. Therefore, this Court is without authority to question whether the judgment reflects the events as they really occurred. "There being nothing whatever in the record to the contrary, this court must in consequence assume that a proper motion after reasonable notice—in all essentials as prescribed by amended R.S., art. 2211 (Now Rule 301, T.R.C.P.)—was made, otherwise the court would neither have acted non obstante veredicto nor so recited that it had been done after considering a motion made by the appellee with that objective." *Crowder v. National Life & Accident Ins. Co.*, 90 S.W.2d 267 (Tex.Civ.App., Galveston, 1935, dism.).

We overrule points of error Nos. 18, 19 and 20.

By its point of error No. 21 SW Title asserts the trial court erred in failing to grant it indemnity over and against Grynwald. It urges that the basis of the suit is "the action" of Grynwald, which, from the brief becomes clear, refers not to Grynwald's depositing and disbursing the funds

but to his failure to furnish Northland with valid estoppel certificates.

This point is bottomed on the letter of instruction from Northland to SW Title, wherein authority was granted to proceed with the closing "whenever you have satisfied yourself that all requirements . . have been met . . . ." SW Title insists that Grynwald's not having determined the genuineness of the signatures on the estoppel certificates amounts to a failure to so satisfy himself, and thus establishes his liability to his principal, SW Title.

In the pleadings and at trial, SW Title urged indemnification against Grynwald on the theory that he breached his duty by handling the funds as he did. In his motion for new trial, it urged that " . . . the action made the basis of the Plaintiff's (Northland's) lawsuit against this Defendant (SW Title) was *action* of said Defendant Jeffrey Grynwald, as an alleged agent of this Defendant." (Emphasis ours.) "Action," as we see by reading the brief of SW Title, means the acceptance of the signatures on the estoppel certificates without having ascertained their authenticity. That is, SW Title is urging a new theory of recovery on appeal for the first time.

■ It is settled law that points raised for the first time on appeal cannot ordinarily be considered thereon. T.R.C.P. Rules 324 and 375; 3 Tex.Jur.2d Rev.App. & Err. —Civil Cases § 98 (1974); *Mascorro v. Victoria,* 394 S.W.2d 530 (Tex.Civ.App., Waco, 1965, ref., n. r. e.). This Court is not required to review this new theory of recovery.

SW Title, in its brief under this point, contends that where one is held to be liable for the negligent or tortious act or acts of others, such party has the right to full indemnity from such other person.

■ However, even if this Court is required to consider this point, there is still a compelling reason why granting indemnity over against Grynwald would bring about an unjust result in this case; SW Title ratified the acts of Grynwald.

The applicable law is stated in 2A C.J.S. Agency § 101—Effect of Ratification—Between Agent and Principal: "A valid ratification by the principal relieves the agent from any liability to the principal which would otherwise result from the fact that the agent acted in an unauthorized way or without authority." See also Restatement of Agency, 2d (1958) 416; Mechem on Agency, 2d ed. (1914) Sec. 491; Story on Agency § 239; *Boyd v. Jacobs,* 6 Tex.Civ. App. 442, 7 Tex.Civ.App. 131, 25 S.W. 681 (1894, no writ hist.).

We overrule point of error No. 21.

■ SW Title urges in points of error Nos. 22 and 23 that Bank should indemnify SW Title because it was guilty of conversion and negligence in accepting the $55,-000.00 check for deposit to the escrow account of Grynwald.

SW Title did not alleged or prove ownership of the funds here involved.

In *Lone Star Beer, Inc. v. First National Bank of Odessa,* 468 S.W.2d 930 (Tex.Civ. App., El Paso, 1971, no writ hist.), that court had before it a similar fact situation and held that in order to recover under the pleadings filed, Lone Star Beer must allege and prove ownership of the funds or its entitlement thereto.

SW Title failed to prove entitlement to possession because the payee of the check was intended to act only as an intermediary for ultimate disposition of the funds to the true owners.

■ It is undisputed that the true owners received the funds in the amounts to which they were entitled. The loss was occasioned not by conversion of the funds but because SW Title failed to furnish Northland with valid estoppel certificates. If the Bank acted improperly in accepting the deposit in Grynwald's escrow account, its act produced no harm to SW Title.

In addition thereto, the jury found that Grynwald was the agent of SW Title and SW Title had ratified his action.

■ Additionally, the cause of action brought by SW Title against the Bank is

barred by the two-year statute of limitations, V.A.T.S. Article 5526.

The record reflects that SW Title brought the cross-action against the Bank more than two years after it had full knowledge of the alleged conversion or acts of negligence.

Whether this be an action for negligence or conversion it is barred by the two-year statute of limitations. *Howell v. National Bank of Commerce*, 181 S.W.2d 837 (Tex. Civ.App., San Antonio, 1944, ref.); *Christian v. First Nat. Bank of Weatherford*, 531 S.W.2d 832 (Tex.Civ.App., Fort Worth, 1975, ref., n. r. e.).

We overrule points of error Nos. 22 and 23.

By points of error Nos. 24, 25, 28, 29, 30 and 31 SW Title asserts the trial court erred in granting judgment upon the jury's answer to special issue No. 3 because that issue inquired of the reasonable cash market value of Lots 7, 8, 9 and 10 of the North Richardson Addition but did not specify whether these lots were in Block 2 or 5 of this addition because Northland had liens on both and therefore the jury could not have known which tract was involved. It also raises no evidence, insufficient evidence and against the great weight points in connection with the *submission* of this issue.

The record reflects that there was no confusion resulting from the failure to designate that these lots were in Block 2. Northland foreclosed on the lots in Block 5. The jury could not have been misled. The Bank, not Northland, foreclosed on the property in Block 2. It is obvious that even SW Title was not confused in the manner in which this issue was submitted because by its points of error Nos. 26 and 27, infra, it complained of the error of the court in failing to submit to the jury how much Northland received from its foreclosure of the property in *Block 5.* SW Title in its objections to the court's charge made it clear that it knew that special issue No. 3 referred to the property in Block 2. It also objected to the charge because the court failed to submit to the jury the value of Lots 7, 8, 9 and 10 in Block 5.

In its brief under these points SW Title states that "The reasonable cash market value of the lands secured by Appellant's Deed of Trust are as follows: Lots No. 6, 7, 8, 9 and 10, in Block 2 $292,000.00; . . . Lots No. 7, 8, 9 and 10, in Block 5; $76,500.00". The jury found in answer to special issue No. 3 the reasonable cash market value of Lots 7, 8, 9 and 10 was $265,000.00. There is no evidence in the record as to the value of Lots 7, 8, 9 and 10 in Block 5. The witness Jones, an expert witness, testified that the fair market value of Lots 7, 8, 9 and 10 in Block 2 was $265,000.00. This is the value that the jury found in answer to this issue.

In addition thereto SW Title failed to point out any such asserted defect in the court's charge in its objections to the trial court's charge. It thus waived this objection. Rule 274, T.R.C.P.

The central issue in the trial of this case was related to the value of the lots in Block 2 and not to the value of any lots in Block 5.

We overrule points of error Nos. 24, 25, 28, 29, 30 and 31.

By its points of error Nos. 38, 39 and 43, SW Title asserts the trial court erred in the submission of Special Issue No. 1 because same was a comment by the Court on the evidence in that it told the jury that Grynwald did not follow closing instructions contained in the letter from Northland to Guarantee Title.

The objections to the Court's charge did not specifically point out this alleged error in connection with Issue No. 1.

It is undisputed that Grynwald did not carry out the instructions for closing contained in the letter of October 15, 1971. It follows then that the court did not comment on the weight of the evidence.

SW Title also asserts error in the submission of Issue No. 2 which contains the identical language as Issue No. 1 except it inquires whether or not Grynwald was acting as an apparent agent on the occasion therein described. The complaint is the is-

sue is too broad and too general. The issue as submitted is now authorized by Rules 277 and 279, T.R.C.P. See article entitled, "A New Start on the Special Verdict," by Justice Jack Pope, in 37 Texas Bar Journal 335.

These points are overruled.

■ By its point No. 44 SW Title asserts the trial court erred in submitting Issue No. 2 because the definition of apparent agent injected the want of ordinary care, and the jury should have been instructed that an apparent agent is one who intentionally induced Northland to believe he was an agent of SW Title.

In connection with Special Issue No. 2 the court defined an "apparent agent" as follows: "In connection with the foregoing issue you are instructed that an 'apparent agent' is one whom Southwest Title Insurance Company either intentionally or by want of ordinary care induced, if it did, Northland Building Corporation to believe him to be the agent of Southwest Title Insurance Company if you find no such authority had either expressly or by implication been conferred upon Jeffrey Grynwald."

In *Pioneer Casualty Company v. Blackwell,* 383 S.W.2d 216 (Tex.Civ.App., Waco, 1964, ref., n. r. e.), the applicable principle of law is stated as: "The existence of apparent authority is based upon estoppel, and one seeking to charge a principal through the apparent authority of an agent 'must prove such conduct on the part of the principal as would lead a reasonably prudent person, using diligence and discretion, to suppose that the agent has the authority he purports to exercise.' *Chastain v. Cooper & Reed,* 152 Tex. 322, 257 S.W.2d 422, 427."

The definition given by the trial court is the same definition approved in *Lloyds Casualty Insurer v. Farrar,* 167 S.W.2d 221 (Tex.Civ.App., Dallas, 1942, affirmed 141 Tex. 497, 174 S.W.2d 302).

■ If the above definition is erroneous it would be harmless error because the jury found that Grynwald was the agent of SW Title and further found that his acts were ratified by SW Title.

In addition thereto, Guarantee Title had been authorized by SW Title to appoint escrow officers. It is also uncontroverted that Guarantee Title, acting as an admitted agent of SW Title, authorized Grynwald to do all acts necessary to close this transaction, including the endorsement of the check and the disbursements of the funds.

In this connection, Crutchfield, Vice President and General Counsel for SW Title, testified: "The various agents may appoint escrow officers."

Point No. 44 is overruled.

By point No. 49 SW Title contends error because the proper measure of damages was not pled.

■ It is not necessary for the measure of damages to be pled. All that is necessary is that the petition sufficiently allege facts establishing a cause of action from which the court can determine the proper measure of damages. If the facts establishing the cause of action are sufficiently set up in the pleadings, and if they are supported by the evidence, the measure of damages is a matter of law for the court; and it then becomes the duty of the court to instruct the jury properly as to the measure of damages. 17 Tex.Jur.2d 263, Damages, § 197, Measure of Damages (1960). *Beason v. Marshall,* 353 S.W.2d 234 (Tex.Civ.App., Austin, 1962, ref., n. r. e.); *United Ventures, Inc. v. Samsill Bros. Plastic Corp.,* 540 S.W.2d 577 (Tex.Civ.App., Fort Worth, 1976).

We overrule point of error No. 49.

■ Point No. 50 asserts error in overruling the motion for instructed verdict because there was no evidence upon which to apply the proportionate reduction clause of the policy.

SW Title contends the proper method for submitting the measure of damages suffered by insured, who has sustained a partial rather than a total loss, is set out in *Southern Title Guaranty Co., Inc. v. Prendergast,* 494 S.W.2d 154 (Tex.Sup., 1973).

The title policy there involved provided (where the loss was less than total): ". . . 'less than the whole of the property, then

the liability of the Company shall be only such part of the whole liability limited above as shall bear the same ratio to the whole liability that the adverse interest, claim, or right established may bear to the whole property, such ratio to be based on respective values determinable as of the date of this policy.'"

Because of this language contained in the policy there before that court, the court held that such formula should be used in assessing damages.

The title policy in the case before us contains no such clause or language.

It was not error for the trial court to refuse to apply the measure of damage contained in another policy containing a different measure of damages than that found in the policy before this Court.

We overrule point of error No. 50.

■ By point No. 58, SW Title asserts error in overruling its motion for instructed verdict on the grounds there was no showing of damage because Northland was not prevented from trying to protect its security interest.

SW Title contends that Northland should have bid on the property at the foreclosure sale.

The record reflects that the amount of the debt owing the Bank secured by liens on the property was greatly in excess of the amounts shown in the estoppel certificates and in the title policy. There was no equity left for Northland. In order to mitigate damages Northland tendered to the Bank a sum equal to that represented in the estoppel certificates and in the title policy. The Bank refused this tender. The superior liens were in an amount in excess of $64,000.00 over and above the amount represented to Northland. The value of the property, in excess of the amount of the liens so represented, excluding this $64,000.00 excess, was sufficient for Northland to have recovered its debt. Therefore, Northland suffered a loss as a result thereof.

SW Title relies upon *Sade v. Staley*, 212 F.Supp. 631 (U.S.Dist. of Columbia, 1963).

That case is not in point. It holds in a stockbroker's action against a customer for damages caused for failure to deliver stock that the plaintiff ". . . may not sit back and watch his damages grow and seek to collect them when in his judgment they have become sufficiently enhanced."

We overrule point No. 58.

Points Nos. 59 and 60 assert error in awarding pre-judgment interest at the rate of 18% and post-judgment interest at the rate of 10%.

The foreclosure and hence the loss occurred on August 1, 1972. Judgment provides that Northland recover judgment in "the sum of $45,801.14 with interest thereon at the rate of 18% per annum from August 1, 1972, until the date of this judgment and then with interest on such amount of $45,801.14 from the date of this judgment until paid at the rate of 10% per annum . . ."

■ The judgment thus was for the amount of the unpaid balance of the principal of the note, plus interest to date of judgment, at the rate of 18% per annum (which was the amount of interest provided for in the note). The title policy insured for the "actual loss" to the insured because of the failure in title to its security. The amount of the loss was not only the amount of the unpaid principal but the loss of interest provided for in said note.

In *Fidelity Union Casualty Co. v. Wilkinson*, 94 S.W.2d 763 (Tex.Civ.App., Dallas, 1936, affirmed 131 Tex. 302, 114 S.W.2d 530, opinion adopted) that court had before it an action upon a mortgagee's title insurance policy. The title company raised the same question that SW Title has here raised and the court held contrary to such position. In this connection that court said: ". . . therefore, the insured's 'actual loss,' by virtue of the failure in title to his security, must be valued at an amount equal to the note, with *interest* and attorney fees, to which the security was attached. Evidently, the *interest* and attorney fees, as provided in the note, are as much the 'actual loss' to the insured as the principal of the loan.

We do not understand by what canon of construction could it be said that the title policy, covering insured's loss, only applies to the principal of the note and not to the *interest* and attorney fees, as provided therein." (Emphasis ours.)

The general rule is that pre-judgment interest may be allowed as damages upon unliquidated demands, whether they arise out of breach of contract or out of tort, when the principal damages are determinable and established at a definite time, either by rules of evidence or known standards of value. There are exceptions to this rule which are not applicable to the case before us. *Watkins v. Junker,* 90 Tex. 584, 40 S.W. 11 (1897); *Texas Company v. State,* 154 Tex. 494, 281 S.W.2d 83 (1955); *Hayek v. Western Steel Company,* 478 S.W.2d 786 (Tex.Sup., 1972); *McDaniel v. Tucker,* 520 S.W.2d 543 (Tex.Civ.App., Corpus Christi, 1975, no writ hist.); *Davidson v. Clearman,* 391 S.W.2d 48 (Tex.Sup., 1965); *New York Underwriters Insurance Co. v. Coffman,* 540 S.W.2d 445 (Tex.Civ.App., Forth Worth, 1976).

The interest rate after judgment was limited by the trial court to 10% after the date of judgment because of the provisions of Article 5069–1.05 V.A.T.S. (1975 Amendment), which provides that the maximum amount of interest rate after judgment is 10% per annum.

We overrule points of error Nos. 59 and 60.

By points 26 and 27 SW Title contends error because the court did not submit to the jury the amount of money received by Northland by reason of its foreclosure sale on the lots 7, 8, 9, and 10 in Block 5; and for the further reason the court did not submit to the jury the amount of credit that should be allowed Northland by reason of such foreclosure sale on said lots in Block 5.

Northland foreclosed its deed of trust liens on the remaining tracts of land on which the Bank had no liens. At foreclosure sale Northland received $10,000.00 which it applied as a credit on the debt of Dal-Rich, thus reducing the principal amount of the debt here involved. SW Title did not plead or prove that these public sales were not conducted in accordance with the terms of the deeds of trust or that the sums received at such public sale were inadequate. There is no evidence that SW Title attempted to bid on this property at said sale.

SW Title failed to plead "payment" as required by Rules 94 and 95, T.R.C.P. In the absence of pleadings, under Rules 94 and 95, SW Title was in no position to present evidence nor now to take the position that the balance owed on the note as pled in Northland's pleadings was incorrect. This precludes it from now claiming that different amounts of payments or credits should have been allowed by virtue of the foreclosure sale or otherwise. This is true even though SW Title was not a party to such note.

In *First National Bank in Dallas v. Whirlpool Corp.,* 517 S.W.2d 262 (Tex.Sup., 1974) that court had before it the question of priority of lienholders. That court held that a holder of a deed of trust lien could not raise the fact that a mechanic's lienholder, Whirlpool, had received payment for some of the supplies furnished (although such supplies had been furnished by Whirlpool not to the deed of trust lienholder but to the owner of the property) since the deed of trust lienholder had failed to plead "payment" as required by Rules 94 and 95.

Since Northland pled the amount of the notes secured by the lien and proved that it was the owner and holder of the note, the amount of payments and credits that had been allowed and the unpaid balance due and owing; then SW Title having not pled payment and offering no evidence to the contrary cannot now raise for the first time on appeal the question of whether or not proper credits had been allowed on the note.

Points of error Nos. 26 and 27 are overruled.

By points of error Nos. 55–57 SW Title asserts error of the trial court in not in-

structing a verdict on the grounds that the title policy in question specifically states that it is subject to the two liens made the basis of this suit, giving the book and page number and that prior thereto Northland knew the book and page number of both liens; Northland did not rely upon any language in the exception to the policy but relied upon the estoppel certificates; that this is an attempt to make SW Title guarantor of the loan which is prohibited by Article 9.08 of the Insurance Code.

This suit is not an attempt to require SW Title to guarantee the payment of the superior liens but only to (1) require SW Title to accurately follow through on express, written closing instructions, once it undertakes to do so in connection with a transaction and (2) for SW Title to pay to Northland the loss incurred by virtue of the fact that the prior liens secured indebtedness in an amount exceeding the amount represented by such title insurance policy and estoppel certificates by some $64,000.00.

The title policy refers to the two liens held by the Bank and gives the volume and page where they are recorded, and recites the original amount of the debts being secured. These notes were dated February 24, 1971, and February 17, 1971, respectively. The policy does not reflect the fact that the liens contained "dragnet" clauses which could have the effect of securing amounts greatly in excess of the amounts referred to in the policy.

In the case before us, prior to the issuance of the policy and the disbursement of the money, SW Title was on notice that Northland was prepared to loan money to Dal-Rich that would be secured by 2nd and 3rd liens. It is obvious that the lender should be put on notice that the 1st liens held by the Bank contained "dragnet" clauses and as a result thereof the amount of debt secured by the liens might be greatly in excess of that reflected by the title policy.

The purpose in obtaining title insurance is to insure good title and for the purchaser of such insurance to be aware of any exclusions without having to proceed to the courthouse, check the records, and carefully analyze the provisions of any liens.

In *San Jacinto Title Guaranty Company v. Lemmon,* 417 S.W.2d 429 (Tex.Civ.App., Eastland, 1967, ref., n. r. e.) that court had before it a title policy that simply referred to the map or plat recorded in the county clerk's office but did not show that said plat contained easements and other matters that would constitute a title defect. That court held that a simple reference to the recording of an instrument was not sufficient to put the insured upon notice of the contents thereof. That court specifically held: "A purchaser of such insurance seeks to avoid the necessity and responsibility of checking, examining and analyzing complex public records to determine the condition of title to land, to be assured of the existence of such good title and to be indemnified against loss through defects in title."

It is our opinion, under the facts in this case, the title policy should have revealed the existence of "dragnet" clauses in these liens. In any event, if we be in error in this regard, SW Title was liable for failing to follow the instructions in the commitment letter and in disbursing the funds without following the instructions and conditions contained in the commitment letter and instructions to SW Title.

The record reflects that Northland relied upon obtaining valid estoppel certificates as well as a title policy correctly revealing the exceptions to coverage described above. SW Title's contention that Northland must be confined to only one of these grounds of recovery is not meritorious. It may rely upon both grounds of recovery or either of them since its loss is within the limits of the policy.

These points of error are overruled.

This Court has carefully considered each point of error and severally overrules each.

Judgment affirmed.